APPLICATION OF LAFFERTY, Appellant v. STATE
for and on behalf of JAMESON, Respondent

(125 N.W.2d 171)

(File No. 10063. Opinion filed December 17, 1963)

Robert L. O'Connor, Sioux Falls, for Applicant and Appellant.

Frank L. Farrar, Atty. Gen., Walter W. Andre, Asst. Atty. Gen., Pierre, for Respondent.

RENTTO, J. An information filed in the Circuit Court of the Twelfth Judicial Circuit by the State of South Dakota, charged the applicant, Henry Lafferty, with having committed the crime of rape in the second degree in Ziebach County, South Dakota, on August 15, 1960. On arraignment he appeared with counsel and pleaded guilty. Upon such plea he was found guilty as charged and sentenced to five years in the State Penitentiary. This appeal presents the contention that the state lacked jurisdiction to proceed against him.

While confined in the penitentiary he applied to the Circuit Court of the Second Judicial Circuit for a writ of habeas corpus claiming that because he was an Indian ward of the United States government enrolled on the census rolls on the Cheyenne River Indian Reservation, and his offense was committed in Indian country, it was within the exclusive jurisdiction of the Federal court. The writ was issued, but after a hearing thereon, at which he appeared with counsel, the trial court found that the offense was not committed within Indian country, quashed the writ and denied the applicant any relief. He appeals.

It is conceded by all parties that if the locus of this offense was within Indian country, the other essentials are present to

bring it within the exclusive jurisdiction of the United States under the provisions of 18 U.S.C.A. § 1153, the ten major crimes statute. Nor is there any dispute as to where the act took place. The parties stipulated that it was committed on Lot 26 of Kennedy's Acreage, which is incorporated into the town of Dupree, Ziebach County, South Dakota. There is nothing in the evidence, nor in the patent issue therefor to Robert M. Kennedy on June 11, 1912, to indicate that the United States ever in any manner reserved title to this area or that it was ever previously allotted to an Indian.

What constitutes Indian country has been declared by the Congress. 18 U.S.C.A. § 1151, provides:

"Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

In the circumstances of this case we are not concerned with subsections (b) or (c). Applicant's claim of Federal jurisdiction, as we understand it, is predicated only on subsection (a).

The Cheyenne River Indian Reservation was created by the Act of April 30, 1888, Ch. 206, 25 Stat. 94, and the Act of March 2, 1889, Ch. 405, 25 Stat. 888. It is agreed by the parties that the area now occupied by the town of Dupree, including Kennedy's Acreage, is within the boundaries of the reservation as defined in those laws. The next Federal enactment of importance in this matter is the Act of May 29, 1908, Ch. 218, 35 Stat. 460. It concerns an area of the Cheyenne River Indian Reservation and an area of the Standing Rock Indian Reservation. The parties also

agree that the above described townsite is within the area of the Cheyenne River Indian Reservation described in this act, but they differ as to whether the act changed the character of such premises from Indian country to non-Indian country.

The 1908 Act authorized and directed the Secretary of the Interior to sell and dispose of all that portion of the Cheyenne River Indian Reservation described therein, containing probably more than one-half of the lands of the original reservation and being a solid contiguous area along its northern and western boundaries, except such portions thereof as have been allotted to Indians, and other provisos not here material. Such lands were to be disposed of under the homestead and townsite laws of the United States and be opened to settlement and entry by proclamation of the President. The net proceeds of these sales were to be deposited at interest in the Treasury and used for the benefit of the Indians of the reservation. Sections 16 and 36 of each township were reserved for the common schools of the state. Apparently the town of Dupree came into being in 1910 under section 5 of this act.

Significantly, it further provided that prior to such proclamation the Secretary of the Interior, in his discretion, may permit Indians who have an allotment within the area described "to relinquish such allotment and to receive in lieu thereof an allotment anywhere within the respective reservations thus diminished." See United States v. La Plant, 8 Cir., 200 F. 92. Also indicative of the intent of the Congress is the provision that Indians residing upon their allotments in certain townships in the area described, shall have the right to use the timber in said townships for domestic purposes "only as long as the lands remain part of the public domain." The effect of such act is decisive of this litigation.

In State ex rel. Raymond Edward Hollow Horn Bear v. Jameson, 77 S.D. 527, 95 N.W.2d 181, we discussed a substantially similar enactment involving the Pine Ridge Indian Reservation, saying:

"That the act was motivated by a congressional purpose to reduce the area of Pine Ridge is manifest. In

effect it separated the reservation into two parts. That which the act denominates as the 'diminished' reservation, and which we elect to refer to as the 'closed' portion of the reservation, was to remain unchanged and to continue to serve the purposes of the government in protecting and dealing with the whole Indian population of the reservation as in the past. The remainder of the reservation, which we will refer to as the 'open' portion of the reservation, was to undergo change through a process of settlement into homesteads and townsites."

In our view Congress by this act placed the area therein described outside the limits of the Cheyenne River Indian Reservation. State v. Sauter, 48 S.D. 409, 205 N.W. 25. In fact, in the Act of July 11, 1940, Ch. 616, 54 Stat. 1336, the Congress in authorizing the Secretary of the Interior to reinstate some entries or purchases therein that had been canceled, referred to these opened lands as being within an area that had been ceded.

■ Since the locus of the offense in question was not within "the limits of any Indian reservation under the jurisdiction of the United States government," we are compelled to the conclusion that applicant's contention is without merit. In commenting on the definition of Indian country set out in 18 U.S.C.A. § 1151, we said in the Hollow Horn Bear case "that the Congress intended subsection (a) to apply to the closed area of reservations." See also Application of De Marrias, 77 S.D. 294, 91 N.W.2d 480; State v. De Marrias, 79 S.D. 1, 107 N.W.2d 255; DeMarrias v. State, D.C., 206 F.Supp. 549, affirmed on appeal, 8 Cir., 319 F.2d 845. Accordingly, we hold that applicant's offense was not committed in Indian country and that the State of South Dakota had jurisdiction of his crime.

■ Chapter 576, 48 Stat. 984, approved June 18, 1934, in Section 3, states: "The Secretary of the Interior, if he shall find it to be in the public interest, is hereby authorized to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public land laws of the United States:" It is suggested that the approval of this act re-established the boundaries

of the Cheyenne River Indian Reservation as those originally defined in the Acts of April 30, 1888 and March 2, 1889. We do not so construe it. If applicant's view were correct there would be no need for section 7 of the Act by which the Secretary of the Interior is authorized to proclaim a new reservation on lands acquired under the act or to add such lands to existing reservations. Moreover, there is no proof or claim that the locus of the crime has been restored to tribal ownership by the Secretary pursuant to the act.

In argument it is urged on behalf of the applicant that the tribe, and the Department of the Interior, including the Bureau of Indian Affairs, have considered and treated the exterior boundaries of the Cheyenne River Indian Reservation as being those established pursuant to the 1889 Act. This is based on an assertion in a letter received by counsel from a deputy commissioner of the Bureau. Implicit in this is the suggestion that it is an administrative interpretation of the 1908 Act which is entitled to controlling weight. This we think untenable.

■ ■ Such interpretations are among the extraneous circumstances utilized by courts as aids in statutory construction. Consequently, they are pertinent only if the meaning of the statute under consideration is so doubtful that the court is compelled to avail itself of extrinsic aids in reaching a conclusion. 82 C.J.S. Statutes § 359; 50 Am. Jur., Statutes, § 319; Burke v. Burkhart, 42 S.D. 604, 176 N.W. 743. Since the act in question is not of that character the rule has no application here. Furthermore, the utility of such interpretations in the field of statutory construction derives from the fact that they are contemporaneous with the enactment of the statute and have been continuous. Neither of these requirements can be spelled out of the letter referred to.

The case of Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, is urged as supporting applicant's position. We do not so read it. That case indicates that the 1892 Act there involved diminished the Colville Indian Reservation by removing therefrom the north half and holds that the Act of 1906, relied on by the State of Washington as the basis for its jurisdiction, did not diminish or destroy the south half or lessen Federal jurisdiction over the Indians having tribal rights thereon. The 1908 Act

here involved is unlike the 1906 Act in the Colville case, but similar to the 1892 Act in that each diminished the reservation involved by restoring a portion thereof to the "public domain." In the Colville case the crime was committed within the reservation as diminished. Here it occurred in the area removed from the reservation by the Congress.

Affirmed.

All the Judges concur.