STATE, Appellant v. BARNES, Respondent

(137 N.W.2d 683)

(File No. 10215. Opinion filed November 3, 1965)

**Frank L. Farrar,** Atty. Gen., **Walter W. Andre,** Asst. Atty. Gen., Pierre, **Andrew Aberle,** State's Atty., Dewey County, for plaintiff and appellant.

**Ramon A. Roubideaux,** Ft. Pierre, South Dakota, for defendant and respondent.

HOMEYER, J. Defendant-respondent, Robert Barnes, a non-Indian, was charged with the murder of Jerald A. Longbrake, a Cheyenne River Sioux Indian, by an information filed in the Circuit Court of Dewey County, South Dakota. His motion to dismiss for lack of jurisdiction was granted and the state appeals.

The alleged crime occurred on a county road between the NE¼-33 and the NW¼-34-13-22, E.B.H.M. in Dewey County, South Dakota. The parties stipulated that John King obtained a patent in fee to the NE¼-33 on September 20, 1916; that Gust A. Speker obtained a patent in fee to the NW¼-34 on October 10, 1917; that since said dates the described tracts have been under continuous non-Indian ownership and possess an unrestricted nontrust status. The locus of the alleged offense is within an area which Congress opened for sale and disposition under the homestead and townsite laws of the United States pursuant to presidential proclamation. Act of May 29, 1908, Ch. 218, 35 Stat. 460, Proclamation of the President, August 19, 1909, 36 Stat. 2500.

██ ██ Respondent contended in the court below and again on this appeal that the locus of the alleged crime was in Indian country as defined in 18 U.S.C.A. § 1151, consequently within the sole and exclusive jurisdiction of the United States, 18 U.S.C.A. § 1152, and that he was not subject to prosecution in the state courts. Williams v. United States, 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962; Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820, Ann.Cas.1913E 710; United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676; United States v. Ramsey, 271 U.S. 467, 46 S.Ct. 559, 70 L.Ed. 1039; State v. Kuntz, N.D., 66 N.W.2d 531; 27 Am.Jur., Indians, § 51; Federal Indian Law, U. S. Dept. of Interior, 1958, pages 323, 324. We have consistently held that crimes committed by Indians against Indians or non-Indians and crimes committed by non-Indians against Indians on nontrust land in the opened portion of Indian reservations are within the jurisdiction of our state courts. Application of DeMarrias, 77 S.D. 294, 91 N.W.2d 480; State v. De Marrias, 79 S.D. 1, 107 N.W.2d 255, Cert. den. 368 U.S. 844, 82 S.Ct. 72, 7 L.Ed.2d 42; State ex rel. Hollow Horn Bear v. Jameson, 77 S.D. 527, 95 N.W.2d 181; Application of Lafferty, 80 S.D. 411, 125 N.W.2d 171; State v. Sauter, 48 S.D. 409, 205 N.W. 25. See also United States v. LaPlant, 8 Cir., 200 F. 92; De Marrias v. State of South Dakota, D.C., 206 F.Supp. 549, 8 Cir., 319 F.2d 845. Respondent recognizes these holdings, but he says that a document entitled Order of Restoration issued by the Secretary of Interior on January 21, 1952[1], "restored" the locus of the alleged offense to the Indian country and hence to the sole and exclusive jurisdiction of the United States. We do not agree. The Secretary's Order provides:

"Whereas, under authority contained in the act of Congress approved May 29, 1908 (35 Stat. 460), providing for the disposition of surplus unallotted lands in the Cheyenne River Reservation, South Dakota, certain surplus lands were opened to settlement and entry under the general provisions of the homestead and townsite laws of the United States, by Presidential Proclamation of August 19, 1909 (36 Stat. 2500), and

---

1. Federal Register Document 52-1317, filed Feb. 1, 1952, 8:45 a. m.

"Whereas, there are now remaining undisposed-of on the opened portion of the Cheyenne River Reservation a number of tracts of said surplus lands which, while of little value for the original purpose of settlement and entry, upon thorough investigation, have been found to be valuable to the Indians of said reservation in order properly to support and develop their rapidly expanding cattle industry, and

"Whereas, by relinquishment and cancellation of homestead entries an additional area of similar lands may hereafter be added to the class of undisposed-of surplus lands, and

"Whereas, the Superintendent of the Cheyenne River Reservation, the Area Director and the Commissioner of Indian Affairs have recommended restoration to tribal ownership of all the undisposed-of surplus lands and interests in lands within the following described areas: (then appears a general description of approximately 39,000 acres including all of sections 33 and 34-13-22, E.B.H.M. where the alleged murder took place)

"Now therefore, by virtue of the authority vested in the Secretary of the Interior by sections 3 and 7 of the act of June 18, 1934 (48 Stat. 984), I hereby find that restoration to tribal ownership of all lands which are now, or may hereafter be, classified as undisposed-of surplus opened lands within the area above described, being within the boundaries of the former Cheyenne River Reservation, will be in the public interest, and they are hereby restored to tribal ownership for the use and benefit of the Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota, and the same are added to and made a part of the existing Reservation, subject to any valid existing rights."

The Act of June 18, 1934, referred to as authority in the above Order is commonly called the Wheeler-Howard Act

or the Indian Reorganization Act of 1934. We will refer to it herein as the Indian Reorganization Act.[2] Its comprehensive character and purpose appears from the title: "AN ACT To conserve and develop Indian lands and resources; to extend to Indians the right to form business and other organizations; to establish a credit system for Indians; to grant certain rights of home rule to Indians; to provide for vocational education for Indians; and for other purposes." The first two sections prohibit further allotment of lands to Indians in severalty and extend existing periods of trust and restriction on alienation of Indian lands. Section 3 mentioned in the Order provides: "The Secretary of Interior, * * * is hereby authorized to **restore to tribal ownership** the **remaining surplus lands of any Indian reservation** heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential Proclamation, or by any of the public land laws of the United States: * * *" (Emphasis supplied) It is clear the restoration authority granted to the Secretary was limited to a certain class of lands, i. e., "remaining surplus lands". Lands which had been previously opened to settlement and sold, or otherwise disposed of,[3] did not fall within such classification.[4]

Subsequent sections permit tribal acquisition of additional lands by purchase or exchange and provide funds therefor. Other sections are designed to provide educational advantages, job preferences, and in general to upgrade the economic lot of the Indian population.

Section 7 mentioned in the Secretary's Order above provides: "The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on lands **acquired** pursuant to any authority conferred by this Act, **or to add such land to existing reservations.** Provided, That lands added to existing reservations shall be designated for the **exclusive use of In-**

---

2. 48 Stat. 984, 25 U.S.C.A. § 461 et seq.

3. Lands reserved for the common schools, sections 16 and 36; lands reserved for agency, school and religious institutions. Act of May 29, 1908, Ch. 218, 35 Stat. 460, Secs. 1, 7.

4. Congressional intent of what constituted "surplus land" appears from the Senate debate prior to passage. Congressional Record—Senate—June 12, 1934, p. 11136: "Mr. O'Mahoney: Let me ask, what lands will come within the definition of surplus land? Mr. Wheeler (one of bill's sponsors): Simply the lands which have not been sold, which were offered for sale and have not been sold to anybody."

dians entitled by enrollment or by tribal membership to residence at such reservations."[5] (Emphasis supplied)

The language employed is clear and precise and its meaning is plain. There is no room for judicial construction or interpretation. Kalmbach v. City of Mobridge, 81 S.D. 158, 132 N.W.2d 293. The only land which could be added to existing reservations was land which the Indian tribes acquired under the provisions of the act and its use was limited to Indians entitled to enrollment or tribal membership at such reservation.

No authority was conferred upon the Secretary to add the land where the alleged crime occurred—land which did not have any Indian connection by virtue of the Indian Reorganization Act—and make it a part of the reservation so as to confer jurisdiction upon the United States courts. We hold the locus was not within Indian country and the trial court erred in dismissing the charge against respondent.

We find it unnecessary to determine the scope and effect of the Secretary's Order, supra, or his reason for describing in such Order tracts which had been disposed of and were under non-Indian ownership. Since the paragraph preceding the descriptions uses the phraseology "have recommended restoration to tribal ownership of all the undisposed-of surplus lands and interests in lands **within the following described areas:**" and the concluding paragraph recites "* * * I hereby find that restoration to tribal ownership of all lands which are now, or may hereafter be, classified as undisposed-of surplus opened lands within the area above described * * *", (Emphasis supplied) it would be consonant with the purposes of the Indian Reorganization Act to conclude the long-range policy of the secretary was to attempt to consolidate in tribal ownership all lands within such area by purchase, exchange or otherwise, and as such acquisition progressed, to include such lands within the reserva-

5. Congressional Record—House—June 15, 1934, p. 11730. Congressman Edgar Howard of Nebraska (co-sponsor) speaking for the bill said: "Any lands acquired under this bill may be added to existing reservations, but no Indian who is not a member of or enrolled on such a reservation or entitled to such enrollment may use such lands." (Emphasis supplied).

tion. However, absent such acquisition and divestiture of individual rights the status of tracts previously sold or for other reasons under non-Indian ownership remained unaffected and without the confines of the diminished reservation.

The briefs and record indicate the trial judge relied on language used in one of our recent decisions[6] as the basis of his dismissal. In Lafferty the crime occurred on an acreage which was incorporated into the town of Dupree and within the opened portion of the Cheyenne River Agency. With reference to the land opened by the 1908 Act[7], after quoting from the Hollow Horn Bear case[8] we said: "In our view Congress by this act placed the area therein described outside the limits of the Cheyenne River Indian Reservation."

Petitioner in Lafferty, among other things, had contended that Congress by passage of the Indian Reorganization Act in 1934 had re-established the original exterior boundaries of the reservation. In answer to this contention, the court said:

"We do not so construe it. If applicant's view were correct there would be no need for section 7 of the Act by which the Secretary of the Interior is authorized to proclaim a new reservation on lands acquired under the act or to add such lands to existing reservations. Moreover, there is no proof or claim that the locus of the crime has been restored to tribal ownership by the Secretary pursuant to the act."

In that case the Order of Restoration was not a part of the record. The statement made was in answer to petitioner's contention and was not intended to suggest that any land irrespective of ownership included in an "Order of Restoration" promulgated under the act was returned to the reservation and again became Indian country.

The Seymour case[9] is again referred to in the briefs. The factual situation and the limitations of the Indian Reorganization

---

6. Application of Lafferty, 80 S.D. 411, 125 N.W.2d 171.

7. Act of May 29, 1908, Ch. 218, 35 Stat. 460.

8. State ex rel. Hollow Horn Bear v. Jameson, 77 S.D. 527, 95 N.W.2d 181.

9. Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346.

Act distinguish the two cases the same as it did in Lafferty. Here again the crime occurred in the opened portion of the reservation and not in the closed or diminished portion as in Seymour. That checkerboard jurisdiction exists, we must admit. However, it necessarily results from the laws which Congress has enacted from time to time in seeking to provide for the American Indian.

Reversed.

All the Judges concur.