Joseph A. RUSS and James Whipple, Plaintiffs,

and

Covelo Indian Community of the Round Valley Indian Reservation, By and Through its Community Council, a recognized Indian tribal community, Plaintiff in Intervention,

v.

Richard E. WILKINS, as Fish and Game Warden, California Department of Fish and Game, and G. Raymond Arnett, as Director, California Department of Fish and Game, Defendants.

No. C–73–2279–CBR.

United States District Court, N. D. California.

March 22, 1976.

James F. King, Jr., Art Bunce, California Indian Legal Services, Escondido, Cal., for plaintiffs and plaintiff in intervention.

Evelle J. Younger, Atty. Gen., Carl Boronkay, Asst. Atty. Gen., Roderick E. Walston, Charles W. Getz, IV, Deputy Attys. Gen., San Francisco, Cal., for defendants.

MEMORANDUM OF OPINION

RENFREW, District Judge.

This case raises the questions of the exact boundary of the Round Valley Indian Reservation (Reservation) in Mendocino County, California, and whether the State of California has jurisdiction to regulate hunting upon that Reservation.

On April 15, 1973, plaintiffs Russ and Whipple, two enrolled members of the Covelo Indian Community of the Reservation, shot a deer on land they claim is part of the Reservation. The land in question is located within the boundary of the Reservation defined by Congress in 1873, Act of March 3, 1873, 17 Stat. 633 (Act of 1873), but is outside the area selected and retained for the Indians

pursuant to the Act of October 1, 1890, 26 Stat. 658 (Act of 1890).[1] The plaintiffs were apprehended and the deer confiscated by defendant Wilkins of the California Department of Fish and Game, who denies that the locus of the shooting was within the present Reservation and asserts jurisdiction in any event under California law.

Plaintiffs Russ and Whipple brought this action against Wilkins and the Director of the California Department of Fish and Game seeking $100 damages for the value of the confiscated deer and declaratory and injunctive relief establishing the right of plaintiffs and other members of the Covelo Indian Community to hunt and fish on all portions of the Reservation defined by Congress in 1873. Plaintiff in Intervention Covelo Indian Community of the Round Valley Reservation seeks declaratory relief to establish (1) its sole authority to regulate all hunting and fishing on the Indian country of the Reservation, and over the rivers and streams surrounding the Reservation, as to Indians and non-Indians alike, and (2) the exact boundary of the Indian country of the Reservation. It also seeks injunctive relief to restrain defendants *from* enforcing California Fish and Game Law on the Reservation. The action has been tried on a bifurcated basis, the first phase of which is to determine whether the disputed land is part of the Reservation.

### History of the Reservation

The Round Valley [2] was originally selected for Indian purposes by the Department of the Interior in 1856. It became the home of Yuki, Wylackie, Nevada, Concow, and Indians of other tribes, many of whom had been displaced from other areas of California. In 1870, pursuant to the Four Reservations Act,

Act of April 8, 1864, 13 Stat. 39, President Grant established the Reservation by executive order and expanded the original tract by approximately 6,000 acres.[3]

A major revision of the Reservation was undertaken by Congress in the Act of 1873. 12,000 acres of Reservation agricultural land were "restored to the public lands". As compensation, 89,000 acres of generally mountainous land to the north were added to the Reservation. The 1873 Reservation was approximately 102,000 acres in size.

The record in this case establishes, however, that the Indians had a very limited enjoyment of the lands allocated to them by Congress. Ranchers and land speculators had begun to enter the area in the 1850s and often laid claim to the lands pursuant to the Swamp Lands Act, 9 Stat. 519, which vested title in the states to lands which were "overflowed" or "swamp" in character and thereby unfit for cultivation. By 1875, over 97,000 acres of the Reservation were occupied by non-Indians, and the 800 Reservation Indians were confined to an area of no more than 5,000 acres. The Committee on Indian Affairs, in investigating this problem in 1885, found that there were only nine settlers who could legitimately claim 160 acres each, and that the rest of the claims were without any legal basis.[4] The Reservation Indians were afraid to travel on the Reservation at large, and their cattle were often stolen in large numbers.[5]

On October 1, 1890, Congress again dealt with the Reservation in "An Act to provide for the reduction of the Round Valley Indian Reservation, in the State of California, and for other purposes" (Act of 1890). The Act of 1890 provided that a portion of the Reservation was to be allotted in ten-acre tracts to individu-

---

1. The Act of 1890 provided for a commission which would select a portion of the Reservation for the Indians. Refer to the procedures set up in the Act. 26 Stat. 659.

2. The Round Valley briefly had also been known as the Valley of Nome Cult.

3. Kappler, Indian Affairs, Laws and Treaties, Vol. 1, pp. 824–828 (1904).

4. Committee on Indian Affairs, Report No. 1522, U.S. Senate, 48th Cong., 2d Sess. (Feb. 27, 1885, ser. # 2274), p. 2.

5. *Id.* pp. 2–3; and Report of General O. O. Howard, U.S.A., to Adjutant General, U.S.A., Sept. 14, 1887 (National Archives).

al Indians and that additional lands were to be held for the Indian community in common. (See the "General Indian Allotment or Dawes Act", Act of February 8, 1887, 24 Stat. 388.) All claims by non-Indians within these Indian allotted portions were to be appraised and compensated. The remainder of the Reservation was to be surveyed into 640-acre tracts and put up for sale with the proceeds, after deduction of certain expenses, placed in the Treasury of the United States to the credit of the Indians. The Act appointed a commission to carry out the actual division and allotment of the Reservation. The commission allotted the southwest portion of the Reservation to the Indians and offered the rest at public sale. Only 1,223 acres [6] were actually sold out of the 63,600 acres offered and, consequently, Congress later amended the Act of 1890 to reduce the plot sizes from 640 acres to 160 acres in size. Act of February 8, 1905, 33 Stat. 706.

The last change in the Reservation was effected pursuant to the Wheeler–Howard Indian Reorganization Act of 1934, 48 Stat. 984, 25 U.S.C. § 463(a). Section 3 of that Act provides, in pertinent part, that the Secretary of the Interior may "restore to tribal ownership the remaining surplus lands of any Indian reservation" previously opened to sale. In 1947 the Secretary of the Interior restored the unsold portions of the Reservation which had been offered for public sale by the Acts of 1890 and 1905. The restored areas totaled about 7,531 acres.

### Boundary of the Reservation

■ The threshold issue before the Court is whether the "reduction" of the Reservation by the Act of 1890 was intended by Congress to restore the northern portion of the Reservation to the public domain or to merely hold it as surplus Reservation land. The Court follows the rule in *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92, 106 (1973), that "[a] congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history". Such an intent will not be imputed, and " 'doubtful expressions are to be resolved in favor of the weak and defenseless people who are wards of the nation, dependent upon its protection and good faith' ". *DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1093, 43 L.Ed.2d 300, 314 (1975), quoting *Carpenter v. Shaw*, 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478, 481 (1930). On many occasions Congress has unilaterally terminated sections of reservations by restoring them to the public domain, and indeed had done so to an earlier portion of the Reservation in 1873. At that time Congress used express language to terminate the reservation status of lands and return them to the public domain. The Act of 1873 specifically "restored to the public lands" the 12,000 acres it severed from the Reservation. Similar unequivocal language was used in 27 Stat. 63 (1892), which "vacated and restored to the public domain" part of the Colville Indian Reservation in the State of Washington. *Seymour v. Superintendent*, 368 U.S. 351, 354, 82 S.Ct. 424, 426, 7 L.Ed.2d 346, 348 (1962). See also 15 Stat. 221 (1868) in which "the Smith River Reservation is hereby discontinued" and 33 Stat. 218 (1904) in which "the reservation lines of the said Ponca and Otoe and Missouria Indian reservations be, and the same are hereby, abolished". *Mattz v. Arnett, supra*, 412 U.S. at 504, n. 22, 93 S.Ct. at 2258, 37 L.Ed.2d at 106. Similarly, the 1889 Sisseton-Wahpeton Agreement, ratified by Congress on March 3, 1891, 26 Stat. 1036, provided that the tribes involved "hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands . . .", quoted in *DeCoteau v. District County Court, supra*, 420 U.S. at 456, 95 S.Ct. at 1093, 43 L.Ed.2d at 314.

■ There have been disposals of reservation lands, however, in which termination was not the intent of Congress. In these instances, it was congressional

---

**6.** There is no explanation of the irregular figure.

policy to allot acreage to the Indians and to issue patents at public sale to unneeded reservation lands. That such patented lands are to continue to be included within the reservations is made clear by 18 U.S.C. § 1151, which defines "Indian country", in pertinent part, as "all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent". This allotment policy was codified in the General Allotment Act of 1887, 24 Stat. 388, commonly referred to as the Dawes Act. It was designed to "continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing." *Mattz v. Arnett, supra,* 412 U.S. at 496, 93 S.Ct. at 2253, 37 L.Ed.2d at 101. Any surplus land could be offered for sale to the public, with the proceeds to be placed in trust for the Indians. Sale of the surplus lands in an allotment context, without express severance from the reservation, cannot be interpreted to destroy the reservation status of the land. *Mattz v. Arnett, supra,* 412 U.S. at 497, 93 S.Ct. at 2254, 37 L.Ed.2d at 102; *Seymour v. Superintendent, supra,* 368 U.S. at 355–356, 82 S.Ct. at 426–427, 7 L.Ed.2d at 349. A number of statutes were enacted under the allotment and sale policy of the Dawes Act which did not terminate the overall boundaries of reservations.[7] It is not immediately apparent, however, whether the Act of 1890 should be placed among those statutes which terminate reservation land or those which continue reservation land under patent. The word "reduction" under consideration here is unique among the cases and statutes the parties have cited.

■ Unlike those cases where the courts have found the intent to termi-

nate, there is no express language "abolishing", "discontinuing", "restoring to the public lands", or "ceding all claim, right, title, and interest" in reference to the disputed lands here. Defendants argue that "reduction" has the same force and effect as the other phrases found to have caused a termination in other cases. However, such a Congressional intent is not clear from the face of the Act. Reduction is not synonymous with discontinuation, abolishment, restoration, or cession. Hence, we turn to the legislative history in which the word "reduction" was used.

The word "reduction" first appears in Senate Report No. 1522, 48th Cong., 2d Sess. (Feb. 27, 1885, ser. # 2274). The Committee recommended that the Reservation be "reduced" to the current wants of the Indians and that the balance of the Reservation be sold and the proceeds put in trust for the benefit of these or other Indians. The Chairman of that Committee was Senator Dawes, the author of the General Allotment Act of 1887. As has been stated above, the policy of the 1887 Act was to continue lands opened for sale to the non-Indian public within the reservation system. The 1885 report by Chairman Dawes reflects the same intent. There were unsuccessful bills in 1886 and 1888 which also clearly reflect allotment and patent provisions and which were otherwise very similar to the Act of 1890. The legislative history does not make "clear" that the object of the Act of 1890 was to restore part of the Reservation to the public lands. Although most of the land had been occupied by settlers for many years, the 1885 report was clear that most of these claims were without any legal basis.

Defendants next argue that even if the Act does not, on its face, mandate any change in the size of the Reservation, it was applied in such a manner as

---

7. See, *e.g.,* Act of June 17, 1892, 27 Stat. 52, allotting and opening for sale land on the Klamath reservation, considered in *Mattz v. Arnett, supra,* 412 U.S. at 494–495, 93 S.Ct. at 2252–53, 37 L.Ed.2d at 100–101; Act of March 22, 1906, 34 Stat. 80 (Colville reservation), considered in *Seymour v. Superintendent, supra,* 368 U.S. at 354–355, 82 S.Ct. at 426–427, 7 L.Ed.2d at 348–349; Act of May 29, 1908, 35 Stat. 460 (Cheyenne River reservation), considered in *United States v. Erickson,* 478 F.2d 684 (8 Cir. 1973); Act of June 1, 1910, 36 Stat. 455 (Fort Berthild reservation), considered in *The City of New Town, North Dakota v. United States,* 454 F.2d 121 (8 Cir. 1972).

to create a distinct and new smaller Reservation. Thus, we must examine the surrounding circumstances, including similar statutes interpreted by other courts, and the manner in which Congress effected the "reduction" of the Reservation.

In analyzing the meaning of a "reduced" Reservation, the Court is assisted by a decision which considered the word "diminished" to be consistent with continued reservation status. *United States v. Erickson*, 478 F.2d 684 (8 Cir. 1973), examined the Act of May 29, 1908, 35 Stat. 460, which opened reservation lands to settlement and referred to the "reservations thus diminished". That court found that "diminished" merely referred to the area allotted to the Indians; the opened portion was still reservation land and the original boundary was unaffected. 478 F.2d at 686–688. *Mattz v. Arnett, supra,* 412 U.S. at 498–499, 93 S.Ct. at 2254–55, 37 L.Ed.2d at 102–103, holds that referring to a reservation in a "past tense" is merely a natural, convenient and shorthand way to identify the area for allotment, and does not indicate any clear purpose to terminate the reservation. The fact that Indians had abandoned an area and white settlers had moved onto the land also does not affect continued reservation status. 412 U.S. at 499, 93 S.Ct. at 2255, 37 L.Ed.2d at 103. Set forth in an appendix to this Memorandum of Opinion are the leading cases which have construed certain operative language in various statutes affecting Indian reservations and which have found continuations of land within reservations, on one hand, and terminations of Indian country, on the other.

A description of any precise areas to be opened or terminated from the Reservation is conspicuously lacking from the face of the Act of 1890. When the Act of 1873 restored 12,000 acres to the public lands, the area to be restored was delineated by metes and bounds. In the statutes which have been recognized as terminating reservation lands (refer to the appendix hereto), the terminated areas are also precisely identified, either by metes and bounds or otherwise. In 27 Stat. 63, considered in *Seymour v. Superintendent, supra,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, and 33 Stat. 254, considered in *Rosebud Sioux Tribe v. Kneip,* 521 F.2d 87 (8 Cir. 1975), metes and bounds were utilized. In 26 Stat. 1035, 1036, considered in *DeCoteau v. District County Court, supra,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300, portions of the Lake Traverse Reservation had previously been allotted to the tribes there and the termination of the "unallotted lands" had a specific geographical meaning. In 15 Stat. 221 and 33 Stat. 218, noted in *Mattz v. Arnett, supra,* 412 U.S. at 504, n. 22, 93 S.Ct. at 2258, 37 L.Ed.2d at 106, the entire reservations were terminated. The vagueness of the Act of 1890 in affecting any particular area is a factor which militates against finding a termination of a specific part of the Reservation.

Defendants point out that the Commission recommended an unusually distinct boundary around the Indian area, whereas allotments usually resulted in "checkerboard" boundaries between Indians and settlers. See *Seymour v. Superintendent, supra,* 368 U.S. at 358, 82 S.Ct. at 428, 7 L.Ed.2d at 350; *Mattz v. Arnett, supra,* 412 U.S. at 495, 93 S.Ct. at 2253, 37 L.Ed.2d at 101. However, the rather specific segregation of Indian from non-Indian patent areas is well founded in the Reservation's history. The Reservation has had a tragic history whereby proximity to settlers has resulted in a disappropriation of land from the Indians. Furthermore, the open-range system in Round Valley has resulted in a significant number of cattle belonging to the Indians, being intermingled with the herds of cattle of the settlers, being lost or stolen. The unusual allotment boundary here is not sufficient evidence of a termination of the northern portion of the Reservation.

The Court does not find, from the face of the Act of 1890 or the surrounding circumstances, a clear intent by Congress to terminate the disputed land from the Reservation. "[W]hen Congress has once established a reservation, all tracts in-

cluded within it remain a part of the reservation until separated therefrom by Congress." *United States v. Celestine*, 215 U.S. 278, 285, 30 S.Ct. 93, 95, 54 L.Ed. 195, 197 (1909). Therefore, all land within the 1873 boundary is still Reservation land and is Indian country, subject to existing patents as defined in 18 U.S.C. § 1151.

It will now be necessary to proceed to the second phase of the trial to determine whether the State of California has jurisdiction to regulate hunting and fishing on the Reservation.

## APPENDIX

### TERMINATIONS

| Reservation | Statute | Case Construing the Statute | Operative Language |
|---|---|---|---|
| Smith River | Act of July 27, 1868 15 Stat. 221 | *Mattz* v. *Arnett*, 412 U.S. 481, 504 n. 22, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92, 106 (1973) | "the Smith River reservation is hereby discontinued" |
| Sisseton-Wahpeton (Lake Traverse) | Act of March 3, 1891 26 Stat. 1035, 1036 | *DeCoteau* v. *District County Court*, 420 U.S. 425, 456, 95 S.Ct. 1082, 1098, 43 L.Ed.2d 300, 321 (1975) | "The Sisseton and Wahpeton bands of Dakota or Sioux Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands ʺ ʺ ʺ." |
| Colville | Act of July 1, 1892 27 Stat. 63 | *Seymour* v. *Superintendent*, 368 U.S. 351, 354, 82 S.Ct. 424, 426, 7 L.Ed.2d 346, 348 (1962) | "a portion of the Colville Indian Reservation ʺ * ʺ is hereby, vacated and restored to the public domain * * *." |
| Ponca, Otoe, and Missouria | Act of April 21, 1904 33 Stat. 218 | *Mattz* v. *Arnett*, 412 U.S. 481, 504 n. 22, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92, 106 (1973) | "the reservation lines of the said Ponca and Otoe and Missouria Indian reservations be, and the same are hereby, abolished." |
| Rosebud | Act of April 23, 1904 33 Stat. 254 | *Rosebud Sioux Tribe* v. *Kneip*, 521 F.2d 87, 94 n. 21, 98 (8 Cir. 1975) | "The said Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to ʺ * ʺ." |

### NO TERMINATION, BUT LAND CONTINUED WITHIN RESERVATION BY WAY OF ALLOTMENT AND SALE

| Reservation | Statute | Case Construing the Statute | Operative Language |
|---|---|---|---|
| Klamath River | Act of June 17, 1892 27 Stat. 52 | *Mattz* v. *Arnett*, 412 U.S. 481, 494–495, 93 S.Ct. 2245, 2252–53, 37 L.Ed.2d 92, 100–101 (1973) | "That all of the lands embraced in what was Klamath River Reservation in the State of California ʺ * ʺ are hereby declared to be subject to settlement, entry, and purchase." |
| Colville | Act of March 22, 1906 34 Stat. 80, 81 | *Seymour* v. *Superintendent*, 368 U.S. 351, 354–355, 82 S.Ct. 424, 426–427, 7 L.Ed. 2d 346, 348–349 (1962) | "to sell or dispose of unallotted lands in the diminished Colville Indian Reservation, in the State of Washington." "That the said lands shall be opened to settlement and entry * * ʺ." |
| Cheyenne River, Standing Rock | Act of May 29, 1908 35 Stat. 460, 461 | *United States* v. *Erickson*, 478 F.2d 684, 687 (8 Cir. 1973) | "to sell and dispose of all that portion of the Cheyenne River and Standing Rock Indian reservations in the States of South Dakota and North Dakota * * *." "That the lands * * * shall be opened to settlement and entry * * *." "the respective reservations thus diminished * * *." |
| Fort Berthild | Act of June 1, 1910 36 Stat. 455 | *The City of New Town, North Dakota* v. *United States*, 454 F.2d 121, 127 (8 Cir. 1972) | "to sell and dispose of, as hereinafter provided, all the surplus unallotted and unreserved lands within that portion of said reservation * ʺ ʺ." |