**STATE of South Dakota, Plaintiff and Appellant,**

v.

**Marvin Wayne JANIS, Defendant and Appellee.**

**No. 13237.**

Supreme Court of South Dakota.

Argued April 24, 1981.

Decided March 10, 1982.

Dennis R. Holmes and Mark Smith, Asst. Attys. Gen., Pierre, for plaintiff and appellant; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Jerry Matthews, Pine Ridge, for defendant and appellee.

Tom D. Tobin of Tobin Law Offices, Winner, for amici curiae Corson and Ziebach Counties, South Dakota, and Sioux County, North Dakota; William W. Shakely of Tobin Law Offices, Washington, D.C., on brief.

Joseph G. Troisi, Eagle Butte, W. Richard West, Jr. of Fried, Frank, Harris, Shriver & Kampelman, Washington, D.C., for amici curiae Cheyenne River Sioux Tribe and Standing Rock Sioux Tribe; Reid Peyton Chambers, Washington, D.C., on brief.

Charles J. Mickel, Rapid City, for amicus curiae Public Safety Commission Oglala Sioux Tribe.

MORGAN, Justice.

This appeal relates to jurisdiction in areas of the Cheyenne River Indian Reservation opened to settlement by the Surplus Lands Act of May 29, 1908, 35 Stat. 460. It arises from a manslaughter prosecution of Marvin Janis (Janis), an enrolled member of the Pine Ridge Sioux Tribe, who allegedly caused a double-fatality automobile accident on U.S. Highway 212 in Dewey County, South Dakota, within the original boundaries of the Cheyenne River Indian Reservation. It is also alleged that Janis was driving while under the influence of intoxicating liquor when the accident occurred. The trial court dismissed for lack of state jurisdiction. The State appealed. We reverse and remand.

The jurisdictional facts, pertinent to the decision below, were stipulated and, in essence, are as follows: (1) Janis is an enrolled tribal member; (2) he was charged with manslaughter in the second degree; (3) the accident occurred on U.S. Highway 212 in the SW ¼ of Section 10, Township 12 North, Range 23 E.B.H.M., Dewey County, South Dakota; (4) that said site was patented in fee in 1919 and since then has been nontrust property presently owned by a non-Indian; and (5) that said site is within the original confines of the Cheyenne River Indian Reservation and inside that portion of the reservation opened to settlement by the Surplus Lands Act of May 29, 1908, 35 Stat. 460.

Janis moved for dismissal on the grounds that; (1) he is an Indian as that term is defined in 18 U.S.C. 1151; (2) the site of the alleged crime is in "Indian country" as defined by 18 U.S.C. 1151; (3) the federal courts have exclusive jurisdiction of manslaughter offenses allegedly committed in "Indian country" by Indians; and (4) the State is without jurisdiction to prosecute him. The trial court granted the motion.

This court last considered the issue of Indian jurisdiction in opened lands of the Cheyenne River Indian Reservation in *Stankey v. Waddell*, 256 N.W.2d 117 (S.D.1977). In an elaborate discussion of the development of the history of the case law on the subject, this court, in an opinion authored by then Chief Justice Dunn, specifically held that the Surplus Lands Act of May 29, 1908 diminished the Cheyenne River Indian Reservation and, concommitantly, that the courts of South Dakota possess subject matter jurisdiction over the diminished area.[1] In arriving at that decision we relied on our previous opinions in *State v. Barnes*, 81 S.D. 511, 137 N.W.2d 683 (1965) and *Lafferty v. State for Jameson*, 80 S.D. 411, 125 N.W.2d 171 (1963).

We have found no case law that overrules *Stankey* or that persuades us that we should do so now. *Stankey* teaches us that although the decision results in checkerboard jurisdiction on the reservation and some confusion attends criminal jurisdiction in the area,

[I]t cannot compare with the confusion in determining criminal jurisdiction that has existed since *Seymour [v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962)] with Indian defendants charged with a crime within the original boundaries of a reservation claiming federal jurisdiction if convicted in state courts and claiming state jurisdiction if convicted in federal courts. The finality of where jurisdiction belongs far outweighs any problems of determining whether a crime was committed on Indian allotments or on deeded land.

*Stankey v. Waddell*, 256 N.W.2d at 127.

Janis argues that the decision of the Eighth Circuit Court of Appeals in *United States ex rel. Condon v. Erickson*, 478 F.2d 684 (8th Cir. 1973) and *United States v. Dupris*, 612 F.2d 319 (8th Cir. 1979) are authority to reverse *Stankey*. We disagree and endorse our previous opinions since

---

1. "Termination," "diminishment" and "disestablishment" and their derivatives are used in-  terchangeably.

they, the opinion of Judge Bogue in *United States v. Juvenile*, 453 F.Supp. 1171 (D.S.D. 1978), and Judge McMillian's dissent in *United States v. Dupris*, 612 F.2d at 323, more closely follow pertinent United States Supreme Court decisions than the majority opinions in *Dupris* and *Condon*.

We hold that the Surplus Lands Act of 1908, on its face, from surrounding circumstances and legislative history disestablished tribal and federal jurisdiction over unallotted lands on the Cheyenne River Indian Reservation. Thus, the legislative intent sufficiently expresses a policy of disestablishment to override the rule of construction that ambiguities and doubtful expressions are resolved favorably to the Indians. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586–7, 97 S.Ct. 1361, 1362–1363, 51 L.Ed.2d 660 (1977); *DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975), *rehearing denied*, 421 U.S. 939, 95 S.Ct. 1667, 44 L.Ed.2d 95 (1975); *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). In this respect, the instant case is more analogous to *DeCoteau* and *Rosebud* than it is to *Mattz* and *Seymour*.

The most recent diminishment decision, *Rosebud Sioux Tribe v. Kneip*, 430 U.S. at 586, 97 S.Ct. at 1362, considered the effect of three Surplus Lands Acts. There, the Court found a controlling legislative intent to disestablish the reservation. The pivotal expositor of this intent was a pre-statute agreement which unequivocally divested jurisdiction. The agreement, as ratified, stated that the Indian bands "cede, surrender, grant and convey" their unallotted interests. The subsequent divesting Acts merely changed the method of payment to the Indians for the purchase of the opened lands.

Two years before *Rosebud* the Court held in *DeCoteau v. District County Court*, 420

U.S. at 425, 95 S.Ct. at 1082, that an 1891 Surplus Lands Act diminished the Lake Traverse Indian Reservation. As in *Rosebud*, the Court relied on a previously negotiated agreement. The ratifying act provided that "the Indians cede, sell, relinquish and convey" unallotted lands in exchange for a negotiated amount. *Id.*, at 437, 95 S.Ct., at 1089. This language was precisely suited to diminishment. The Court held that the face of the Act, the legislative history and the surrounding circumstances, clearly indicated an intent to terminate federal and tribal jurisdiction over these lands. *Id.*, at 444, 95 S.Ct., at 1092.

*DeCoteau* cited *Mattz v. Arnett*, 412 U.S. at 481, 93 S.Ct. at 2245, as establishing the rule that a clear intent evidenced by the Act itself, its legislative history or the surrounding circumstances could rebut the presumption of tribal or federal jurisdiction over lands within reservation boundaries.[2] In *Mattz*, an 1892 Surplus Lands Act was held not to terminate tribal or federal jurisdiction over unallotted lands within reservation boundaries because the language of the Act was consistent with a continued reservation status. Moreover, unlike *Rosebud* and *DeCoteau*, this 1892 Act was not preceded by an agreement expressing Indian consent to diminishment. The Court reached its decision after an extensive analysis of both reservation and congressional history.

The seminal opinion in diminishment cases is *Seymour v. Superintendent*, 368 U.S. at 351, 82 S.Ct. at 424, where the Court held that the 1906 Surplus Lands Act for the Colville Indian Reservation opened the reservation for settlement without dissolving reservation boundaries. Primary significance was given to the Act's language which lacked an express reference to termination or, adversely, restoration to the public domain. Moreover, the Act referred specifically to the "Colville Indian Reservation" which would not exist if the Act terminated the boundaries.

2. *Decoteau* was based on and reaffirmed *Mattz*, even though *DeCoteau* used the conjunctive "and" instead of the disjunctive "or" used in *Mattz*. In any event, each of these considera-

tions establish the intent of Congress to diminish the Cheyenne River Indian Reservation, and thereby, vest the State with subject matter jurisdiction.

As in *Rosebud* and *DeCoteau*, James McLaughlin, special agent for the federal government, negotiated an agreement with the Cheyenne River Indian bands. The Cheyenne River Indians agreed "to sell and dispose of" their unallotted interests. Although the instant agreement lacked the word "cede," its presence or absence is not the *sine qua non* of disestablishment. *Rosebud Sioux Tribe v. Kneip*, 521 F.2d 87, 90 (8th Cir. 1975) *aff'd*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). Admittedly, "sell" and "dispose" were used in the surplus lands act considered in *Seymour*, 368 U.S. at 354-5, 82 S.Ct. at 426. Yet, that case did not involve a reference to a "diminished" reservation which is evident, here, in section 2 of the 1908 Surplus Lands Act. In *United States v. Wounded Knee*, 596 F.2d 790, 794 (8th Cir. 1979), the omission of "diminished" from federal legislation became a salient factor in holding that Crow Creek Sioux Indian Reservation was not diminished. Its presence here has an equal but opposite impact.

The instant case differs from *Mattz* and *Seymour*. Both cases considered the effect of unilateral congressional acts not preceded by a negotiated agreement. Unlike those acts, the 1908 Surplus Lands Act began as a previously negotiated agreement entered into by the Cheyenne River Indians. This agreement, and its negotiation and effect closely resembles the situations in *DeCoteau*, 420 U.S. at 425, 95 S.Ct. at 1082, and *Rosebud*, 430 U.S. at 584, 97 S.Ct. at 1361, where the acts disestablished portions of the reservations opened by surplus lands acts. See, *Little Light v. Crist*, 649 F.2d 682, 688 (9th Cir. 1981); *State v. Hero*, 282 N.W.2d 70 (S.D.1979). The presence of the instant agreement suggests an intent to disestablish and heightens the importance of McLaughlin's reports on these negotiations.

*DeCoteau*, *Rosebud* and the instant case present different facts than the Court faced in *Seymour*. In *Seymour*, 368 U.S. at 354, 82 S.Ct. at 426, the Court upheld termination of the north half of the Colville Indian Reservation. Washington argued that a 1906 Act also disestablished the southern half. Thus, any subsequent reference to a reservation was obviously an expression of intent that a portion of the Colville Indian Reservation existed, since a single reservation can have only two halves. Because the instant Act would not destroy or abolish the entire Cheyenne River Indian Reservation, subsequent references to an existing reservation are, at best, equivocal, absent further explication in the 1908 Surplus Lands Act. This explanation exists in the 1908 Surplus Lands Act's reference to the amount of acreage reserved.

The 1908 Act left the Cheyenne River and Standing Rock Indians approximately 1.4 million acres "as diminished." S.Rep.No. 439, 60th Cong., 1st Sess. (1908). Before this Act, the reservations contained 5.25 million acres. *Stankey v. Waddell*, 256 N.W.2d at 126. Moreover, the Act was described as opening about one-half of the reservation. *Id.*, at 126. Thus, the 1908 Act presents a precise determination, lacking in *Mattz*, of the respective acreages under state or federal control. As in *DeCoteau*, the present reference to "unallotted lands" has a specific geographical meaning. See *Russ v. Wilkins*, 410 F.Supp. 579, 583 (N.D.Cal.1976) *rev'd*, 624 F.2d 914 (9th Cir. 1980). These facts, inter alia, indicate a clear intent to disestablish a portion of the Cheyenne River Indian Reservation.

The legal analysis initiated in *Seymour* has been expanded by subsequent cases. *Puyallup Tribe v. Dept. of Game of State of Washington*, 433 U.S. 165, 173 n. 11, 97 S.Ct. 2616, 2622 n. 11, 53 L.Ed.2d 667, 675 n. 11 (1977). *Mattz* went beyond the language of the Act and rules of construction to determine the issue of diminishment. *Rosebud* took the analysis further by inquiring into the jurisdictional treatment of the area. A comparison of these four cases reveals that; (1) opening a reservation alone does not diminish its boundaries, but, does create an inherent ambiguity regarding jurisdiction over opened lands, (2) ambiguity is resolved by a searching inquiry into the legislative intent evidenced in the Act itself, its legislative history, the historical and surrounding circumstances of its promulgation, and

jurisdictional treatment of the area, and (3) an equivocal legislative intent preponderates against termination.

With these principles in mind, we find the Eighth Circuit's opinion in *United States ex rel. Condon v. Erickson*, 478 F.2d at 684, deficient.[3] In *Erickson*, the Eighth Circuit held that the 1908 Surplus Lands Act did not diminish the Cheyenne River Indian Reservation. Much of the Circuit Court's analysis depends on possible hypothetical interpretations of the Act, unsupported by contemporaneous expressions of legislative intent or surrounding circumstances. For instance, the opinion explicitly recognizes that sections 2 and 9 of the 1908 Surplus Lands Act, 35 Stat. 460, returned the opened lands to the public domain. The Eighth Circuit sweeps this under the rug by theorizing a possible intent to temporarily restore lands to the public domain. Indeed, this is precisely an example of the language found in *Seymour* to support termination. *Seymour v. Superintendent*, 368 U.S. at 354, 82 S.Ct. at 426.

Moreover, the majority opinion in *Erickson* recognizes that South Dakota exercised jurisdiction since, as early as, 1911 when *United States v. La Plant*, 200 F. 92, 95 (D.S.D.1911), was decided. There, the District Court of South Dakota found that jurisdiction rested in the State. *United States ex rel. Condon v. Erickson*, 478 F.2d at 689. Although *Erickson* cites *La Plant*, the majority opinion fails, contrary to the decision in *Rosebud*, to give significance to the State's ensuing exercise of jurisdiction. See, e.g., *State v. Barnes*, 137 N.W.2d at 683; *Lafferty v. State for Jameson*, 125 N.W.2d at 171. Instead, it announces that the exercise has been inconsistent.

Furthermore, the majority in *Erickson* sparingly used contemporaneous interpretations of the 1908 Act. See, e.g., *Lafferty v. State for Jameson*, 125 N.W.2d at 175. James McLaughlin, the Indian agent who negotiated with the tribe, made exhaustive reports of his dealings with the Cheyenne

River Indian bands. Since words are interpreted as the Indians themselves would have understood them at the time of the Act, See *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); Garry, Jurisdictional Confusion on the Cheyenne Indian Reservation; *United States v. Dupris*, 25 S.D.L.Rev. 354, 360 (1980), the meaning of "diminished" and "sell and dispose," as used in the 1908 Act and its previous agreement, are best interpreted by references to McLaughlin's statements of tribal understanding, not admittedly equivocal subsequent legislative treatment. *United States ex rel. Condon v. Erickson*, 478 F.2d at 688.

We do not consider the antipodal opinion of the *Dupris* majority to be binding authority. On appeal of that decision the Supreme Court, in *Dupris v. United States*, 446 U.S. 980, 100 S.Ct. 2959, 64 L.Ed.2d 836 (1980), issued a memorandum decision which summarily granted certiorari, vacated the judgment and remanded the case to the District Court. A denial of certiorari by the Supreme Court lacks precedential significance. *Griffin v. United States*, 336 U.S. 704, 69 S.Ct. 814, 93 L.Ed. 993 (1949); *Sunal v. Large*, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947). By negative implication, a grant of certiorari imbues the opinion with precedential weight.

After granting certiorari in *Dupris*, the Supreme Court summarily vacated the judgment. "Such summary action occurs when the court, or majority thereof, is convinced that the decision below is so clearly erroneous as to make oral argument a waste of time." Stern and Gressman, Supreme Court Practice, § 5.12 at 362 (5th ed.). Since certiorari issued to the Eighth Circuit Court of Appeals, the Supreme Court vacated that court's decision.

Vacation of a decision is often used interchangeably with reversal. See, e.g., *National Nut Co. v. Kelling Nut Co.*, 61 F.Supp. 76, 80 (N.D.Ill.1945); *SEC v. C. M. Joiner Leasing Corp.*, 53 F.Supp. 714 (N.D. Tex.1944). "A judgment vacated on appeal

---

**3.** Although the Eighth Circuit also decided in *United States v. Dupris*, 612 F.2d 319, that the 1908 Act had not terminated the reservation, that decision merely reiterates the position taken in *Erickson*.

is of no further force and effect, *Riha v. International Tel. & Tel. Corp.*, 533 F.2d 1053, 1054 (8th Cir. 1976) (per curiam), and lacks precedential weight." *County of L.A. v. Davis*, 440 U.S. 625, 634 n. 6, 99 S.Ct. 1379, 1384 n. 6, 59 L.Ed.2d 642, 651 n. 6, quoting *O'Connor v. Donaldson*, 422 U.S. 563, 577–78 n. 12, 95 S.Ct. 2486, 2495 n. 12, 45 L.Ed.2d 396, 408 n. 12 (1975); *Troy State University v. Dickey*, 402 F.2d 515 (5th Cir. 1968). Although several of the amicus curiae rely on *Dupris*, the Circuit Court's opinion lacks binding precedential force.

The Circuit Court decision in *Dupris* is not revitalized because the issue of mootness was raised before the United States Supreme Court. Although it was the duty of counsel to raise this issue, See Stern and Gressman, supra, § 18.3 at 896, that Court did not consider the facts concerning mootness. Clearly, the Supreme Court could have decided the issue of mootness. See e.g., *United States v. Munsingwear, Inc.*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); See also, Stern and Gressman, supra, §§ 15.13, 18.2 and 18.4. Instead, the Supreme Court remanded *Dupris* to the District Court for its decision on mootness. If the Supreme Court had vacated *Dupris* because the appeal was moot, as counsel argue, the Eighth Circuit's order,[4] the District Court's consequent hearing, and the subsequent appeal were superfluous actions.

*Stankey*, as well as the District Court opinion of Judge Bogue in *United States v. Juvenile*, 453 F.Supp. at 1171, and Judge McMillian's dissent in *United States v. Dupris*, 612 F.2d at 323, present an exhaustive analysis of the 1908 Act, its contemporaneous interpretations and legislative history, surrounding circumstances, reservation history and jurisdictional treatment. We incorporate them by reference to avoid unnecessary replication of the salient facts. We again hold that the 1908 Surplus Lands Act divested the tribe and federal government of jurisdiction over unallotted lands within its purview.

The circuit court's dismissal is reversed and the case remanded for trial.

DUNN, HENDERSON and FOSHEIM, JJ., concur.

WOLLMAN, C. J., concurs specially.

WOLLMAN, Chief Justice (concurring specially).

Although I agree with the result and the reasoning set forth in the majority opinion, I do not join in that language that might be construed as being unfairly critical of the decisions of the Court of Appeals for the Eighth Circuit. The pertinent decisions of the United States Supreme Court are hardly so apodictic as to admit of only one conclusion in any given factual and historical situation. For example, would our decision in *State v. Molash*, 86 S.D. 558, 199 N.W.2d 591 (1972), be the same if the case were presented today? See *State v. White Horse*, 89 S.D. 196, 231 N.W.2d 847 (1975).

---

4. "Pursuant to the directive of the Supreme Court of the United States, the judgment of this court filed November 27, 1979, is hereby vacated, and the cause is remanded to the United States District Court for the District of South Dakota (Central Division) to consider the question of mootness." *United States v. Dupris*, 664 F.2d 169, at 171 (8th Cir. 1981).