Accordingly, the decision of the district court is

AFFIRMED.

UNITED STATES of America,
Appellant,

v.

Glen D. DUPRIS, Appellee.

No. 78–1575.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 11, 1978.

Decided Nov. 27, 1979.

Rehearing Denied April 14, 1980.

Carl Strass, Atty., App. Section, Land and Natural Resources Div., Dept. of Justice, Washington, D. C. (argued), James W. Moorman, Asst. Atty. Gen., Anthony C. Liotta, Acting Asst. Atty. Gen., Robert L. Klarquist, Steven E. Carroll, Neil T. Proto, Attys., Dept. of Justice, Washington, D. C., and Robert D. Hiaring, U. S. Atty., Sioux Falls, S. D., on brief, for appellant.

W. Richard West, Jr., Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C., for amicus curiae, Cheyenne River Sioux Tribe.

David L. Bergren, Fort Pierre, S. D., for appellee.

Tom D. Tobin, Winner, S. D., for amicus curiae, Dewey, Ziebach and Corson Counties, South Dakota, and the County of Sioux, North Dakota.

Before HEANEY, ROSS and McMILLIAN, Circuit Judges.

HEANEY, Circuit Judge.

The United States appeals from the judgment of the District Court[1] dismissing an information against Glen D. Dupris, who was charged with burglary and larceny. Dupris was prosecuted under 18 U.S.C. § 1153 which provides exclusive federal jurisdiction over specified offenses committed by any Indian in "Indian country."[2] The District Court granted Dupris' motion to dismiss on the ground that there was no federal jurisdiction pursuant to 18 U.S.C. § 1153 because Eagle Butte, where the crime occurred, was not "Indian country." The District Court refused to follow the earlier opinions of this Court in *United States v. Long Elk*, 565 F.2d 1032 (8th Cir. 1977); *United States ex rel. Condon v. Erickson*, 478 F.2d 684 (8th Cir. 1973) (which involved the same portion of the Cheyenne River Indian Reservation as is here in question); and *City of New Town, North Dakota v. United States*, 454 F.2d 121 (8th Cir. 1972), believing that these opinions had been undermined by *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). It held that, while Eagle Butte was once part of the Cheyenne River Indian Reservation and thus "Indian country," the town lost its reservation status when the portion of the original reservation upon which it sits was opened for settlement in 1908.[3] Because we remain convinced that *Long Elk, New Town* and *Erickson* were correctly decided, and that no prior or subsequent decision of the Supreme Court requires us to abandon our position,[4] we reverse and remand.

In light of our view that this case is controlled by our earlier opinions, there is no need to again detail the reasoning of those cases here. However, in a thorough and scholarly dissent, Judge McMillian today raises arguments which we must now address.

1. The Honorable Andrew A. Bogue, United States District Judge for the District of South Dakota.

2. Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery and larceny *within the Indian country,* shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

18 U.S.C. § 1153 (emphasis added).

Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territo-

ry thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151.

3. *United States v. Juvenile,* 453 F.Supp. 1171, 1201 (D.S.D.1978).

For the sake of clarity, we note that the question whether the boundaries of an Indian reservation, as drawn when the reservation was established, are redrawn after part of that reservation has been opened for settlement, has been expressed in several different ways by various courts. The process has been called disestablishment (referring to the disestablishment of the original reservation boundaries); diminishment (referring to a diminishing or shrinking of the original boundaries); termination of reservation status (if the original boundaries are redrawn, the reservation status of the land is no longer within the boundaries and thus is terminated); and a change of boundaries.

4. Indeed, *United States ex rel. Condon v. Erickson,* 478 F.2d 684 (8th Cir. 1973), was cited with approval in *Mattz v. Arnett,* 412 U.S. 481, 505 n. 23, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973).

■ The issue here in question, like that in our prior cases, is whether a congressional act that opened portions of an Indian reservation terminated Indian jurisdiction over the opened land.[5] In order for the land to lose its status as "Indian country," disestablishment must have been effected. It is now clear that in order to terminate the rights of Indians in land (to effect a disestablishment of a reservation),

"[a] congressional determination to terminate [an Indian reservation] must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history," *Mattz v. Arnett,* [412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973)][.]

\*      \*      \*      \*      \*      \*

In determining this intent, we are cautioned to follow "the general rule that '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'" *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174 [, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129] (1973), quoting *Carpenter v. Shaw,* 280 U.S. 363, 367 [, 50 S.Ct. 121, 122, 74 L.Ed. 478] (1930). The mere fact that a reservation has been opened to settlement does not necessarily mean that the opened area has lost its reservation status.

*Rosebud Sioux Tribe v. Kneip, supra,* 430 U.S. at 586–587, 97 S.Ct. at 1362–1363 (additional citations omitted).

Certainly, no congressional determination to terminate is expressed in the statute which opened the land in and around Eagle Butte. We must then decide whether the intent to terminate is clear from the surrounding circumstances and legislative history. The dissent finds the necessary intent from several factors, the first of which is the historical context of the legislation. Our colleague reasons that because (1)

South Dakota leaders sought to open Indian lands on all of the state's reservations to settlement with a single-minded ardency, (2) the South Dakota Senators and Congressmen were similarly single-minded in sponsoring all of the bills accomplishing this purpose, and (3) Inspector James McLaughlin conducted negotiations on all the reservations without mention of any reserved jurisdiction for the Indians; therefore, Congress acted with like intent in passing each of the acts. That intent was to diminish the size of South Dakota's Indian reservations.

■ In light of *Rosebud,* we are unwilling to accept this reasoning. We believe that under the decisions of the Supreme Court, it is inappropriate to ascribe the motives of the South Dakota leaders and legislators to Congress as a whole, particularly when the acts in question were over the course of several years. While it may be clear that the South Dakotans sought complete control of as much Indian land as possible and that Inspector McLaughlin aided them in achieving this goal, it is not clear that Congress shared this intent in all, or any, cases.

■ *Rosebud* requires that we examine each act of Congress carefully and individually to determine whether there was a clear congressional intent to terminate. Here, a congressional intent to diminish Indian land, rather than to merely open it to settlement, is not clear. In fact, the opposite conclusion is as easily reached. The South Dakota boosters talked about an *"opening of the reservation,"* dissenting opinion at 327–328 (emphasis added), not diminishing its boundaries. Further, Inspector McLaughlin told the Indians on the Cheyenne River Reservation that "[i]t will be manifestly better for the Indians to have their surplus lands *opened* to settlement" so that they may "readily acquire white man's civiliza-

---

5. We note that the dissent takes a narrow view of the effect of this decision. Our colleague argues that "[a]ccess to federal benefits and programs by Indians living in the opened portion is not affected by [our] decision." Nevertheless, had the dissenting opinion been adopt-ed, then some Indians may have become subject to state laws and regulations and could possibly have lost some control over the lands and resources within the reservation's boundary.

tion and industrious habits[.]" Dissenting opinion at 328 n. 11 (emphasis added). These are not clear expressions of a congressional determination to terminate.

The second factor considered by our colleague is the language of the statute. While he concedes that "no language of cession" is in the statute, he argues that the historical context in which the act was written makes this omission irrelevant. Although we agree that perhaps too much weight has been given in the past to the use of the word "cede" in these statutes, we are not persuaded that the term's presence or absence is totally irrelevant.

Nor are we persuaded by our colleague's argument that this statute was the functional equivalent of those statutes which contain language of cession. He bases this argument on his belief that the statute's drafters told Congress (and Inspector McLaughlin told the Indians) that settlement statutes achieved the same result with or without cession language.

The first problem with this argument is that Congressman Charles H. Burke told his colleagues simply that this act was "in line with the recent bills which have been passed affecting the sale of Indian reservations," dissenting opinion at 329, which is hardly an unambiguous statement of intent. Second, because Inspector McLaughlin's statements were made to Indians in a vastly inferior bargaining position, they were equally ambiguous. He talked about opening the lands for settlement in one breath, and something more than that in the next. Further, even the instructions given to McLaughlin by Indian Commissioner F. E. Leupp are ambiguous. As quoted in the dissenting opinion, those instructions were as follows:

> The instructions given you before you conferred with the Rosebud Indians concerning the opening of Tripp County [the 1907 statute] may be followed *so far as applicable.*

Dissenting opinion at 329–330 (emphasis added, footnote deleted).

In light of these instructions and the history of relations between the Bureau of Indi-

an Affairs and the Indians, we would be reluctant to hold that McLaughlin was necessarily following clearly expressed congressional intent.

The dissent also argues that weight should be given to the provisions of the statute with respect to school lands and intoxicating beverages. Certainly, some weight should be given to the school argument, but there was a similar provision in the act considered in *Long Elk* and we held it was of minimal importance in light of the entire record. *United States v. Long Elk, supra* at 1038–1039. Very little weight can be given to the liquor argument. As the government correctly points out, the Indians specifically requested a 1910 amendment to the Act which made federal liquor laws applicable to all reservation lands held by non-Indians, whether those lands were opened to settlement by the 1908 Act or not.

A fourth factor cited by our colleague as being important is the legislative history. Again, the dissent refers to McLaughlin's meetings with the Indians, Leupp's instructions to McLaughlin, and the South Dakota congressional delegation's statements on the issue. No reference is made to any new quotation from the Congressional Record. We are left then with the ambiguous statements previously discussed.

The fifth factor discussed was whether an agreement between the government and the Indians existed which indicated a congressional intent to diminish the reservation. The dissent concedes there was no written or oral agreement to indicate a contemporaneous understanding. However, it professes to find support for its view in two facts: McLaughlin reported to his superiors that "[t]he general sentiment of the Indians in council with me * * * was in favor of the relinquishment," dissenting opinion at 337, and the South Dakota congressional delegation reported similarly to Congress. We are unwilling to find a clear congressional intent from these obviously self-serving and after-the-fact statements.

■ The final factor discussed by our colleague as indicating congressional intent is the subsequent jurisdictional treatment of the settlement portion of the reservation. In our view, this history can be read in about any way the reader likes. Simply stated, South Dakota has, at times, asserted criminal jurisdiction over this and other reservations and, at times, it has not. We acquiesced in the exercise until Judge Stephenson carefully examined the matter in *Erickson* in 1973, and Judge Bright reexamined it in *Long Elk* in 1977. Both judges held the exercise was improper because the reservations had not been diminished. We adhere to their decisions and to our opinion in *New Town*. These opinions not only have the virtue of clearly delineating the lines of authority in the lands in question, but they are consistent with decisions of the Supreme Court that diminishment of a reservation should only be found where the intent of Congress for such diminishment is clear and unambiguous.

The District Court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

McMILLIAN, Circuit Judge, dissenting.

I must respectfully dissent.

I note initially the narrowness of the issue before this court: whether the State of South Dakota or the federal government has criminal jurisdiction over that portion of the Cheyenne River Indian Reservation which was opened for settlement in 1908. Access to federal benefits and programs by Indians living in the opened portion is not affected by this decision. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 615–616 n.48, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). In *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), the Supreme Court held that federal benefits and programs are available to tribal members living "on or near" the reservation. Because the area opened for settlement is near the reservation, members of the Cheyenne River Sioux Tribe living in the opened area remain eligible for the various benefits and programs.

Prior to 1850, the Indians, who had been pushed west of the Mississippi by white settlers, roamed freely. As the number of settlers in the country grew, they began pushing westward. *United States ex rel. Condon v. Erickson*, 478 F.2d 684, 686 (8th Cir. 1973). To appease both the settlers and the Indians, who did not want farmers, ranchers and railroads destroying their way of life, a treaty was entered into in 1868 creating the Great Sioux Reservation—twenty-five million acres over which the Indians could live as they pleased. 15 Stat. 635 (1868). In 1877, however, the Black Hills region of this reservation, a total of 7,500,000 acres, was severed. 19 Stat. 254 (1877). In 1889, the rest of the Great Sioux Reservation was divided into six separate reservations and the "surplus land," a total of 11,000,000 acres, was opened for settlement. 25 Stat. 888 (1889). Thereafter Congress addressed the remaining six reservations individually and, by statute, opened the "surplus" lands of each. Colonel James McLaughlin, the Indian Inspector sent to negotiate the sale of the western portion of the Cheyenne River Reservation, explained the reasons behind this process to the Indians on this reservation:

I know the sentiment of the Indians regarding their reservations and of their desire to hold them intact, which is only natural, but for the Indians to hold large tracts of unused land is now impossible, my friends, and you must bring yourselves to accept the inevitable, and rely upon the Department to obtain for you reasonable compensation for the lands you do not need.

Large reservations were possible in the past, but there was then what was known as a frontier.

That was when the principal portion of the population of this country lived east of the Mississippi River, but the tide of emigration from European countries to the United States forced home seekers constantly westward from the east and later on eastward from the west until the two waves met and obliterated the so-called frontier.

There is no more frontier where settlers may find homes readily, and the steadily increasing population of the country demands all available land possible for the incoming settlers. The demand for land for home seekers is now so great that Senators and Congressmen are being constantly urged by their constituents to open additional lands to settlement, and the sentiment in Congress to open Indian reservations has been growing stronger each succeeding year for some years past, until the sentiment now prevails that Indians may only retain what land they actually need and can make proper use of.[1]

While I am painfully cognizant of the unfairness of the federal government's policy toward the American Indian, I cannot ignore Congressional intent. *Cf. DeCoteau v. District County Court*, 420 U.S. 425, 449, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1974).

In 1973, this court, in *United States ex rel. Condon v. Erickson, supra,* addressed the precise issue which is before us today.

Condon, a member of the Cheyenne River Indian tribe, was convicted of rape by a South Dakota court. In a habeas corpus petition, Condon argued that the State was without jurisdiction to try him because Eagle Butte, where the crime was committed, was "Indian country" and within exclusive federal jurisdiction. We agreed, holding that that portion of the Cheyenne River Reservation which was opened for settlement in 1908 retained its reservation status. *Erickson, supra,* 478 F.2d at 689. Our holding, which overruled sixty years of precedent, focused on *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1961), which recognized that lands opened for settlement could retain their reservation status.[2]

In *Seymour,* Paul Seymour, a member of the Colville Indian Tribe, was imprisoned in a Washington State Penitentiary for attempted burglary, under a state sentence. He petitioned for habeas corpus on the ground the State of Washington had no jurisdiction because the crime was committed in "Indian country" and thus the feder-

---

1. Minutes of Council Meeting held by James McLaughlin with Cheyenne River Indians, S.Rep.No.439, Part 2, 60th Cong., 1st Sess. 19 (1908).

2. This court's opinion was also based upon two other cases which can no longer be seen as supporting the position in *Erickson: McClanahan v. State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), and *City of New Town, North Dakota v. United States,* 454 F.2d 121 (8th Cir. 1972). *McClanahan* "reaffirmed the long standing 'policy of leaving Indians free from state jurisdiction and control [which] is deeply rooted in the Nation's history.' " *Erickson, supra,* 478 F.2d at 689. *McClanahan,* however, is not especially appropos to the issue before us. There the Court held that Arizona could not impose personal property tax on Indians who resided on the reservation and derived their entire income from reservation sources. The issue in *McClanahan* was whether Indians *on a reservation* had a right to govern themselves, while the issue before us is a more preliminary question, that is, what exactly is the reservation.

In *New Town* this court held that that portion of the Fort Berthold Indian Reservation which was opened for settlement in 1910 retained its reservation status. We based our decision on the fact that the 1910 statute stated: "[n]othing in this Act shall be construed to deprive said Indians of Fort Berthold Indian

Reservation of any benefits to which they are entitled under existing treaties or agreements not inconsistent with the provisions of this Act." We reasoned that the right to be subject to exclusive federal jurisdiction is a "benefit" of which the Indians could not be deprived, and therefore the opened area retained its reservation status. The inclusion of this phrase in a statute opening part of a reservation for settlement can no longer be seen as indicative of Congress's intent on the disestablishment issue, however. In all of the statutes which have been held to have terminated the reservation status of those portions of South Dakota reservations opened for settlement, this phrase was also included. 33 Stat. 256, Art. V (1904) (Rosebud Reservation); 34 Stat. 1230, § 8 (1907) (Rosebud Reservation); 36 Stat. 448, § 11 (1910) (Rosebud Reservation); 36 Stat. 440, § 11 (1910) (Pine Ridge Reservation). (This phrase was not included in the statute opening the Lake Traverse Reservation, 26 Stat. 1036 (1891), but it was not necessarily as appropriate to include it in the Lake Traverse statute because, unlike all of the other South Dakota reservations opened for settlement, the entire Lake Traverse Reservation, not a part of it, was opened for settlement.)

Because of the problems in the above two cases the primary support for the *Erickson* decision must be found in *Seymour.*

al courts had exclusive criminal jurisdiction pursuant to 18 U.S.C. § 1153. The state supreme court held that the land upon which the crime occurred was once part of the Colville Indian Reservation but that it lost this reservation status when the southern part of this reservation was opened for settlement in 1906. The United States Supreme Court reversed stating that merely because the reservation had been opened for settlement did not mean it lost its reservation status. *Seymour, supra*, 368 U.S. at 357–58, 82 S.Ct. 424.

At the time *Erickson* was decided, it appeared that the benefit of doubt *Seymour* gave to the Indians was the approach which should be taken in determining the status of Indian lands opened for settlement. In light of recent Supreme Court cases, however, especially *Rosebud Sioux Tribe v. Kneip, supra*, it appears this trend has shifted. In *Rosebud*, the Rosebud Sioux Tribe sought a declaratory judgment to settle the question whether those parts of the original reservation, as defined in 1889, were disestablished from the rest of the reservation when they were opened for settlement by statutes in 1904, 1907 and 1910. *Rosebud* made clear that *Seymour* was not to be read so broadly: *Seymour* did not establish that an area opened for settlement always retained its reservation status; it merely made clear that a party could not rely merely on this fact to prove disestablishment of reservation status—it must adduce additional evidence which demonstrates Congress's intent to terminate reservation status. *Rosebud, supra*, 430 U.S. at 584, 97 S.Ct. 1361.

In 1977, the South Dakota Supreme Court also addressed this jurisdictional issue, but in a slightly different context. *Stankey v. Waddell*, 256 N.W.2d 117 (S.D.1977). Sophie Stankey, an enrolled member of the Cheyenne River Sioux Tribe, sought abatement of her state personal property taxes on the ground she was exempt from such taxation because her personal property was within the boundaries of the Cheyenne River Reservation. The property was on territory in that portion of the reservation which was opened for settlement in 1908.

The South Dakota Supreme Court questioned the continuing validity of this court's decision in *Erickson* and held that the area opened in 1908 was no longer part of the Cheyenne River Reservation and, therefore, Ms. Stankey was subject to South Dakota personal property taxes.

I am persuaded by *Rosebud* and the voluminous record in the present case, which supports the position taken in *Rosebud*, that *Erickson* should be overruled. I also believe that to the extent this court's opinion in *United States v. Long Elk*, 565 F.2d 1032, 1036 n. 10 (8th Cir. 1977), reaffirmed *Erickson*, it too should be overruled.

The legal principles guiding this court are well established. Our task should be to determine whether, in 1908 when Congress opened the western and northern portion of the Cheyenne River Indian Reservation, it intended to disestablish the original boundaries of the reservation. *Rosebud, supra*, 430 U.S. at 586, 97 S.Ct. 1361. As the majority noted, "[a] congressional determination to terminate must be expressed on the face of the [statute] or be clear from the surrounding circumstances and legislative history," *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1972), and all ambiguity in ascertaining Congress's intent is to be resolved in favor of the Indians, *Rosebud, supra*, 430 U.S. at 586, 97 S.Ct. 1361.

As stated, courts facing this question have recognized that the mere fact part or all of a reservation is opened for settlement does not necessarily indicate Congress's intent that the opened portion loses its reservation status. *Rosebud, supra*, 430 U.S. at 586–87, 97 S.Ct. 1361; *Seymour, supra*, 368 U.S. at 357–58, 82 S.Ct. 424; *Erickson, supra*, 478 F.2d at 687. In other words, when a reservation is opened for settlement, it is possible Congress intended to sever the opened portion of a reservation, causing that area to lose its reservation status and the remaining part of the reservation to have new, circumscribed boundaries; but it is also possible Congress intended to make available to settlers unclaimed plots of land

within a portion of the existing reservation, leaving the original reservation boundaries intact. *Erickson, supra,* 478 F.2d at 687.

The factors courts have focused on to ascertain Congress's intent on this issue are: (1) the historical context of the statute, *cf. DeCoteau, supra,* 420 U.S. at 431–32, 95 S.Ct. 1082; *Long Elk, supra,* 565 F.2d at 1036; (2) the language of the statute, specifically, whether the term "cede" is used, *e. g., Rosebud, supra,* 430 U.S. at 596–97, 97 S.Ct. 1361; *DeCoteau, supra,* 420 U.S. at 439, n. 22, 95 S.Ct. 1082; (3) the role of the United States government and whether the Indians were paid a sum certain, *DeCoteau, supra,* 420 U.S. at 448, 95 S.Ct. 1082; (4) the legislative history, *Rosebud, supra,* 430 U.S. at 592, 97 S.Ct. 1361; *Long Elk, supra,* 565 F.2d at 1039; (5) whether an agreement was reached with the Indians, *Long Elk, supra,* 565 F.2d at 1039; and (6) the jurisdictional treatment of the area in question since it was opened for settlement, *id.* In my view, three of these factors—the language of the statute, the role of the United States government and whether the Indians were paid a sum certain, and whether an agreement was reached—are not relevant to the boundary issue. I believe, however, that consideration of the remaining factors demonstrates that Congress intended to alter the original boundaries of the Cheyenne River Reserva-

tion when it opened for settlement the western and northern parts of this reservation in 1908.

## The Historical Context

The historical context of the 1908 statute opening the western portion of the Cheyenne River Indian Reservation cannot be underestimated. The statute was not an isolated legislative endeavor to bring settlers into the 1,234,000 acres thereby made available,[3] but was part of a much larger movement in Congress prompted by the western states to open as much Indian land as possible in order to attract settlers. For example, between 1890 and 1910, Indian reservations in California, 27 Stat. 52 (1892), Washington, 34 Stat. 80 (1906), Montana, 33 Stat. 352 (1904), Oklahoma, 34 Stat. 80 (1906), South Dakota, *e. g.,* 34 Stat. 460 (1908), and North Dakota, 36 Stat. 455 (1910), were opened for settlement. Of the nine reservations in South Dakota, all or part of six were opened for settlement between 1891 and 1910. The Lake Traverse Reservation was opened in 1891; the other five reservations were opened by six statutes passed in the six years between 1904 and 1910. These statutes were sponsored by essentially the same Congressmen[4] and the negotiations preceding the passage of the statutes were conducted by the same individual, Colonel James McLaughlin.[5]

3. The portion of the reservation opened for settlement by the 1908 act consisted of 1,728,-000 acres. Of this area, 494,005.26 acres were already allotted to the Indians. This left about 1,234,000 acres actually available for settlement.

4. Senator Gamble served in the Senate from 1900 to 1912. Congressman Burke served in the House from 1900 to 1906, when he was defeated. Burke was reelected in 1908, however, and served until 1914. Comment: *New Town et al.: The Future of an Illusion,* 18 S.D.L.Rev. 85, 88 n. 9 (1973).

Senator Gamble sponsored in the Senate every bill opening parts of South Dakota reservations which was passed during his tenure. With one exception (Lake Traverse Reservation), this included all of the statutes opening lands in South Dakota which were ever passed, *i. e.,* the 1904, 1907 and 1910 Rosebud statutes, S.Rep.No.651, 58th Cong., 2d Sess. 1–12 (1904); S.Rep.No.6838, 59th Cong., 2d Sess. 1–7 (1907); S.Rep.No.68, 61st Cong., 2d Sess. 1–5 (1910);

the 1908 Standing Rock and Cheyenne River Statute, S.Rep.No.439, Parts 1 and 2, 60th Cong., 1st Sess. (1908); the 1910 Pine Ridge Statute, S.Rep.No.69, 61st Cong., 2d Sess. 4–5 (1910).

Congressman Burke sponsored in the House every bill opening parts of South Dakota reservations which was passed during his tenure. This included four of the seven such statutes ever passed, including the 1904, 1907 and 1910 Rosebud Statutes; H.R.Rep.No.443, 58th Cong., 2d Sess. 1–19 (1904); H.R.Rep.No.7613, 59th Cong., 2d Sess. 1–8 (1907); H.R.Rep.No. 429, 61st Cong., 2d Sess. 1–5 (1910); and the 1910 Pine Ridge Statute, H.R.Rep.No.333, 61st Cong., 2d Sess. 2 (1910).

5. McLaughlin negotiated with the Rosebud Indians in 1904, 1907 and 1910, *Rosebud, supra,* 430 U.S. at 590, 606, 610, 97 S.Ct. 1361; the Standing Rock Indians in 1908, *Long Elk, supra,* 565 F.2d at 1032; the Cheyenne River Indians in 1908, S.Rep.No.439, Part 2, 60th

Furthermore, as discussed *infra,* the same statutory scheme pervades all the statutes.

In the early twentieth century there was considerable population growth in South Dakota: in 1890 there were 349,000 people in the state; by 1910 there were 580,000,[6] an increase of 66%. The railroads were extending their lines through the state, *cf. DeCoteau, supra,* 420 U.S. at 431, 95 S.Ct. 1082, and cattlemen arrived to take advantage of the reservation lands being leased by the Indians.[7] The South Dakotans did all they could to encourage this settlement in their state. It was imperative, for economic survival, that the barren, sparsely

settled western states, including South Dakota, attract more settlers who would help build farms and towns. Every South Dakota resident was expected to do his share of "boosting," that is, "building up [South Dakota] by offering encouragement to the stranger from other states who [was] now coming to make his home [in South Dakota]."[8]

The following excerpts from statements by contemporary South Dakota leaders are representative of the single-minded concern the South Dakota citizens had for the Indians' land and corresponding callousness toward the rights of the Indians.

Cong., 1st Sess. (1908) and the Pine Ridge Indians in 1910, *United States ex rel. Cook v. Parkinson, infra,* 396 F.Supp. at 487.

6. Hoxie, *Jurisdiction on the Cheyenne River Indian Reservation: An Analysis of the Causes and Consequences of the Act of May 29, 1908,* at 46.

7. In addition to its allotment efforts, the Indian Office also began a program of leasing unallotted reservation land to cattlemen. The first leases were approved in 1902 and by 1904 all of the tribunal land on the preserve had been rented. The leases provided the tribe with an annual income of $90,000 and Indian heads of families were allowed to run 100 head of cattle on the range. Agent Ira Hatch reported that because of these provisions members of the tribe were 'well pleased' with the arrangement. *Id.* at 38. It is questionable whether the land on the Indian reservations not actually being used for farmland by the Indians was "surplus" land if the Indians were able to put it to use by leasing it.

8. Just Keep Boosting
    While on the subject of new settlers, it might be wise to ask if you are doing your proper share toward building up your home state by offering encouragement to the stranger from other states who is now coming to make his home among us? Are you meeting him with a hearty hand-clasp, telling him that he had come to the grandest state in the west—or anywhere on earth—and that if he will only try he can raise anything on his new land which he could raise back where he came from? Are you boosting, or are you too busy to even try to make him feel at home among strangers? A little encouragement offered is the one best thing in the world—and doesn't cost you a cent to give. Not advice, but encouragement.

Make the newcomer feel that he has come among as grand a people as is the state. Make him feel that he is welcome, that he is going to be always welcome when he comes to your town to do his trading, and, in this way, you not only give him encouragement, but you are also building up your town. Because he is coming to the town where he has been made to feel welcome to do his trading. So build up your circle of friends and your town. Even if you are well off and the newcomer is not, make him welcome; because he may in a few years be an independent as are you if he takes advantage of his opportunities and works hard.

Speaking from the viewpoint here at Pierre, nothing better could be done for the future of this city than the organization of an "Encouragement Club"—who would meet all newcomers and tell them they are "welcome to our city," make them feel at home in every way, incidentally giving the newcomer such information as he might wish in regard to what crops he should put in, and other information helpful to him. He could be made to casually meet the merchants of the town and become acquainted with them. All of these to boost, of course, and in every way offer further encouragement to the stranger.

We are a busy people here in the Sunshine state, but we should be able to find time to make the newcomer among us feel that we are glad that he has come. It only takes a moment to say a kind work [word] of encouragement and in almost every case it is a boost for your town and yourself. Say it— and boost all the time. Not because there is any need to worry about the future development of South Dakota, just beginning; for it is being made evident that the future is to be the grand one which the state and its opportunities rightly deserve.
Daily Capital Journal (Pierre, South Dakota) April 13, 1908.

The Indian reservations have stood as a menace to the development and growth of the Commonwealth.[9]

[The Lake Traverse Reservation] is a great detriment to our interests, as it blocks the progress of two or three lines of railroad that we are very anxious to see completed. We need these roads badly, and the opening of the reservation would give new impetus to immigration which has been attracted by government lands further west. Any information that will enable the citizens of this section to render any service that may be needed in hastening the opening will be appreciated.[10]

The significance of this boosterism movement, for our purposes, is its singular concern with obtaining some of the vast reserves of Indian land which were "readily available." Especially significant is the total disregard for the welfare of the Indian, including any consideration of whether terminating the reservation status of the land opened for settlement might be a disservice to those Indians who were still living on the opened portion.[11]

In conclusion, the 1908 statute opening the Cheyenne and Standing Rock Reservations must be viewed in the following context: the "booster" spirit prompted the opening of the reservations for settlement; the same South Dakota Congressmen initiated and sponsored all six statutes; the same individual negotiated with the Indians on all six statutes; and the statutes were passed within six years of one another. Most importantly, as will be discussed in the next two sections, the legislative history indicates that the Indians and lawmakers believed the various statutes affected the respective reservations in the same manner.

*The Statutory Language*

The term "cede" has been viewed as evincing a "clear congressional intent to terminate the 'Indian country' character" of

---

**9.** Senator Burke when submitting a 1910 bill to the Senate which would open part of the Rosebud reservation. 45 Cong.Rec. 1074 (1910).

**10.** Letter from a Banker in Milbank, South Dakota to the Secretary of the Interior. *DeCoteau, supra,* 420 U.S. at 431 n. 8, 95 S.Ct. 1082.

**11.** It is interesting to note the rationalizations engaged in by various individuals who supported obtaining the lands of the Indians. For example:

I now believe that it will be manifestly better for the Indians to have their surplus lands opened to settlement, as it brings in white settlers among them, from whom the Indians may more readily acquire white man's civilization and industrious habits . . . . (McLaughlin, in speaking to the Indians at Cheyenne River Reservation, S.Rep.No.439, Part 2, 60th Cong., 1st Sess. at 19 (April 15, 1908).

. . . and I believe that the placing through what were heretofore reservations actual settlers will have the effect of civilizing the Indians who will have allotments and also give value to these allotments which at present are of little value. (Congressman Burke on the floor of the House, 45 Cong. Rec. 5456–57 (1910)).

I believe greater success [in teaching Indians the best methods of advancement] would be obtained by making it possible for the Indians to mingle with the whites and thus be educated by the example which would be set before them by a class of white farmers.

[Letter from Indian Agent Thomas Downs to the Commissioner of Indian Affairs, Nov. 23, 1907], Hoxie, *Jurisdiction on the Cheyenne River Indian Reservation: An Analysis of the Causes and Consequences of the Act of May 29, 1908,* Appendix 7.

The actual influence of the white settlers appeared to be less than salutary, however. According to Thomas J. King, Superintendent at the Reservation:

The opening of Cheyenne River Reservation was morally disadvantageous to these Indians because the law provided or created, at least for a time, a community without law and officers for the enforcement of the law. This was quickly taken advantage of by bootleggers, gamblers, horse thieves, cattle rustlers and soldiers of good fortune generally. The conditions which existed in this country for about a year after the opening furnished a disgraceful example to the Indians of this reservation and reflected little or no credit on the wisdom and foresight of the government. (Appendix 81, answer to question 10a).

No one can appreciate the character of the towns that have sprung up on the ceded lands and how detrimental to the Indians all their environments and temptations unless he has been here and knows conditions from on the ground. Gambling, whiskey, prostitution and usury are to be found in abundance and the Indian is easy prey." Hoxie, *Jurisdiction on the Cheyenne River Indian Reservation, supra,* at 119.

areas within reservations which are opened for settlement. *See, e. g., United States ex rel. Cook v. Parkinson,* 396 F.Supp. 473 (D.S.D.), *aff'd,* 525 F.2d 120 (8th Cir. 1975), *cert. denied,* 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977). The 1908 statute opening the Cheyenne River and Standing Rock Reservations contains no "cession" language. Some courts would hold, solely on this basis, that Congress did not intend to terminate the reservation status of the area opened for settlement. *See, e. g., Parkinson, supra,* 396 F.Supp. at 479, *aff'd,* 525 F.2d at 122–23; *Ellis v. Page,* 351 F.2d 250, 252 (10th Cir. 1965). Clearly, at least until recently, the presence or absence of this language, if not determinative, was one of the more crucial factors courts relied upon in assessing Congress's intent on the boundary issue. *See, e. g., DeCoteau, supra,* 420 U.S. at 439, 95 S.Ct. 1082; *Long Elk, supra,* 565 F.2d at 1039.

In my opinion, the cession language in the statute is not relevant to the disestablishment issue. The assumption supporting the importance heretofore attached to this language was that the word was reflective only of the boundary issue and that understanding this, Congress used it with precision. *See, e. g., Parkinson, supra,* 396 F.Supp. 473. I believe it is apparent that Congress did not use this word with precision.

This is shown first by the fact that time and again the drafters of the legislation and the government representative sent to explain the legislation to the Indians stated that statutes with cession language had the same result as statutes with no cession language. For example, in presenting to Congress the 1907 statute which opened part of the Rosebud Reservation for settlement, Congressman Burke, the act's sponsor, stated: "It is in line with the recent bills which have been passed affecting the sale of Indian reservations."[12] The 1907 bill was iden-

tical to the statute before us today in that it contained no cession language. The only two prior bills which had been passed opening reservations in South Dakota (the bills to which Congressman Burke referred) contained cession language.

In another example, Colonel James McLaughlin, the representative of the Secretary of the Interior sent to explain the statute to the Indians, told the Rosebud Indians: "You must bear in mind that this agreement [the 1907 statute] provides for the opening of Tripp County the same as your Gregory County lands are being disposed of [by the 1904 statute]."[13] Again, the 1907 statute contained no cession language; the 1904 statute clearly did.

In colloquy especially pertinent to our inquiry, McLaughlin told the Indians on the Cheyenne River Reservation, when negotiating for the 1908 statute:

In 1901, six years ago last fall, I made an agreement with the Rosebud Indians for the payment of a lump sum consideration of $1,040,000. Congress rejected it, but provided for another plan which is *nearly similar to this of yours.* [emphasis added][14]

The agreement negotiated six years before, which McLaughlin referred to, is the 1904 Rosebud statute which has at least four references to the cession of Indian lands. The 1908 statute which McLaughlin explained would have a similar effect as this 1904 Rosebud statute had no references to cession of Indian lands.

Lastly, McLaughlin's only instructions from F. E. Leupp, the Commissioner of Indian Affairs, regarding his negotiations with the Indians on the Cheyenne River Reservation were simply:

The instructions given you before you conferred with the Rosebud Indians concerning the opening of Tripp County [the

---

12. 41 Cong.Rec. 3104 (1907).

13. Council Meeting held by McLaughlin with Rosebud Indians, December 14, 1906, 41 Cong. Rec. 286 (1906–07).

14. Council Meeting held by McLaughlin with Cheyenne River Reservation Indians, March 16, 1908, S.Rep.No.439, Part 2, 60th Cong., 1st Sess. 23 (April 15, 1908).

1907 statute] may be followed so far as applicable.[15]

In the instructions concerning the opening of Tripp County, Leupp told McLaughlin:

> You are now at liberty to . . . enter into negotiations with the Rosebud Indians for the *cession* of the surplus unallotted land in Tripp County . .;
>
> [T]he Department feels that disposal to be made of the proceeds arising from the *cession* is a subject requiring most careful and earnest consideration . . .;
>
> The land *ceded* should be disposed of under the general provisions of the homestead and townsite laws of the United States . . .;
>
> The following would seem to be fair terms, similar to those in the disposal of the *ceded* lands in Gregory County [the 1904 Rosebud statute]. . . .[16]

The above instructions to McLaughlin are significant in three respects. First, Leupp's Rosebud instructions provide another example of an individual familiar with Indian legislation explaining that a statute with no cession language (the 1907 Tripp County statute) will result in cession of lands. Further, more indirectly, Leupp explains that the 1907 statute, which has no cession language, will have the same effect as the 1904 statute, which clearly had cession language. The second significant aspect about McLaughlin's instructions is that, by reference to the Rosebud instructions, Leupp tells McLaughlin to negotiate with the Indians on the Cheyenne River Reservation for the *cession* of their lands, even though there is no reference to cession in the statute. Lastly, the interchange of instructions regarding two different reservations and two different statutes demonstrates the fact that opening the various reservations for settlement was viewed as one ongoing process.

The fact that Congress and others familiar with the Indian legislation did not use the term "cede" with precision is also shown in the actual negotiations concerning the 1908 statute between McLaughlin and the Indians. Both parties consistently refer to the cession of lands contemplated by the 1908 statute even though this statute has no reference to "cession" of lands.

For example, in McLaughlin's report to the Secretary of the Interior after his meeting at the Cheyenne River Reservation about the 1908 bill, McLaughlin stated:

> During the time our council was in session at the agency, a council was also being held at the Cherry Creek substation, 90 miles Southwest of the agency and . . . the farmer in charge . .phoned to me . . . that the Indians of the Cherry Creek district . . . had decided by a vote of 39 to 19—being 2 to 1—to relinquish a part of their reservation, and that 27 had voted to have the *cession* embrace the northern part of the reservation, and 20 voted to have the *cession* taken from the west and north in about equal quantities.[17]

At the council meeting between McLaughlin and the Indians at the Cheyenne River Reservation, McLaughlin equated opening part of the Cheyenne River Reservation for settlement with altering the boundaries:

> I was for many years in favor of leaving the boundaries of the Indian reservations undisturbed; but the results of the system have caused me to change my mind . . . . I now believe it will be manifestly better for the Indians to have their surplus lands opened to settlement.[18]

---

15. Letter from F. E. Leupp, Commissioner of Indian Affairs, to James McLaughlin, December 26, 1907.

16. Letter from F. E. Leupp to James McLaughlin, December 5, 1906.

17. Letter from McLaughlin to Secretary of Interior, March 30, 1908, S.Rep.No.439, Part 2, 60th Cong., 1st Sess. 3 (April 15, 1908).

18. Council Meeting held by McLaughlin with Cheyenne River Reservation Indians. *Id.* at 19.
   References from McLaughlin's council meeting with the Indians at the Standing Rock Reservation are relevant to our inquiry because the same bill opened both reservations and thus was being discussed at both council meetings, and McLaughlin equated the effect the bill would have on each reservation. ("They [the Indians at Standing Rock] saw the wisdom of

The above carelessness with the term cede refutes the assumption that Congress used the word in a deliberate manner. More to the point, the above references demonstrate that the statutes without the cession language were viewed by their drafters and other government representatives as evincing the same intent as statutes with the cession language. Therefore, I cannot agree that Congress used this term in a purposeful manner to indicate its intent on the boundary issue and thus on the ultimate issue of criminal jurisdiction.

Nevertheless, the question arises, if the term "cede" has no relevance to the disestablishment issue, why is it included in some statutes opening part or all of a reservation for settlement and not included in others. After considerable research into the voluminous record presented by the parties, it seems apparent that this language reflects a different scheme of paying the Indians for their land which was adopted by Congress to minimize the financial risks assumed by the federal government in obtaining Indian lands. *Cf.* Comment, *New Town et al.: The Future of an Illusion*, 18 S.D.L.Rev. 85 (1975).

Until 1904, § 1 of the statutes opening part or all of a reservation for settlement provided that the United States government would purchase the land from the Indians who "ceded, surrendered, granted and conveyed" all of their "claim, right, title and interest" in the land to the United States. In consideration the government paid the Indians a negotiated amount, usually $2.50 an acre. The government then sold the land land to settlers. Problems arose with this scheme, however, because when the settlers defaulted on their payments or when the land could not be sold, the government was unable to recoup the amount it had paid the Indians. Concern mounted in Congress over this problem. As Senator Platt stated:

> I do not know how many million acres still remain in Indian reservations which must in the future be opened to public settlement, but there are many millions, and at the rate we have been paying the Indians under the agreements made with them for such lands, the amount to be expended in the not very distant future will run up into the millions.[19]

Therefore Congress adopted a new policy. No longer would it buy the lands from the Indians and then sell it to settlers, but it would authorize the Secretary of the Interior to act as something of a real estate agent for the Indians and sell the land for the Indians to the settlers. And, no longer would the government pay the Indians a set sum; the Indians would receive, as payment for their lands, only what the settlers actually paid. The United States Treasury would keep these funds in a trust, expending them for the benefit of the Indians. In

meeting the wishes of Congress in a very reasonable manner . . . . It is my desire that you meet the question in the same manner as Standing Rock." *Id.* at 20.

As can be seen, a change in boundaries was contemplated by the Standing Rock Indians despite the fact the statute has no references to cession:

> Thomas Frosted, one of the four said spokesmen for the council, expressed his individual views, favoring the opening of the tract indicated in blue pencil on the inclosed map, and he was followed by Tiaka, one of the leading Indians of the reservation, who also strongly spoke in favor of the *cession thus indicated.* *Id.* at 2 (emphasis added).

Arthur Tibbets (one of the spokesmen for the Indians) to McLaughlin:

> We have decided here in council to draw a line showing the land we are willing to *cede*. *Id.* at 7 (emphasis added).

> McLaughlin: Now my friends, as to the lines which I have marked on this map in blue for you to relinquish, if every Indian on this reservation were to receive an allotment within the *diminished* reservation it would still leave you about 500,000 acres of surplus land, and as there are a great many of your people allotted in the tract to be *ceded*, you will therefore have a great many acres of surplus land within your *diminished* reservation. *Id.* at 10 (emphasis added).

> McLaughlin: The Marshall bill gives you permission to select any lands you may wish in the portion to be *ceded* . . . . *Id.* (emphasis added).

> McLaughlin: It is with reference to the shares of minors derived from the proceeds of *cession* of tribal lands. *Id.* at 11 (emphasis added).

19.  35 Cong.Rec. 4801 (1902).

this way Congress obtained its goal—opening Indian lands for settlement—without having to pay a cent, and the Indians now assumed the financial risk of defaulting settlers and unsaleable land. Colonel McLaughlin, in explaining the change in payment scheme to the Rosebud Indians, said:

> There has been a sentiment growing in Congress for a number of years past, and is [sic] now stronger than ever, against paying Indians for ceded lands direct from the U.S. Treasury. This is what is referred to in my letter of instructions, which I read to you, as being a new departure in the manner of disposing of the surplus lands of Indian reservations, and instead of paying Indians direct from the U.S. Treasury as heretofore for their surplus lands; they will be paid from the proceeds of the sale of the lands ceded; the Department thus acting as trustee for the Indians, and the Interior Department having charge of the lands will dispose of them in such manner as will secure to the Indians the highest price obtainable. This is the new departure referred to, and I believe, my friends, that no treaty will ever again be made with Indians, by which they will receive a lump sum consideration for the tract ceded, but only what the Government is able to realize from the sale of the lands.[20]

It should now be apparent why the language of § 1 in the statutes opening land for settlement changed from:

> The said Indians belonging on the Rosebud reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant and convey to the United States all their claim, right, title and interest in and to all part of the Indian Reservation now remaining unallotted. *See, e. g.*, 26 Stat. 1036; 33 Stat. 254 (1904).

to:

> [T]he Secretary of the Interior be, and he is hereby, authorized and directed, as hereinafter provided, to sell and dispose of all that portion [of the reservation]. *See, e. g.*, 35 Stat. 460 (1908); 36 Stat. 448 (1910).

That is, the "cede, surrender, grant and convey" language and "sell and dispose" language reflect two entirely different statutory schemes of how the lands are to be opened for settlement and how the Indians are to be compensated. Because the United States no longer purchased the land, it was not necessary for the Indians to "cede" it over; hence, the cession language was no longer appropriate. Thus, the language reflects a new method of payment rather than an attempt to delineate whether the boundaries of the original reservation remain intact after part or all of the reservation is opened for settlement.

Unfortunately, this analysis is complicated somewhat by the imprecision in the statutory language.

**20.** Council Meeting held by McLaughlin with Rosebud Indians, July 25, 1903.

*See also* Congressman Burke's explanation of the new method of payment when he introduced to the House the 1904 bill opening part of the Rosebud Reservation:

> Both of these bills [referring to the House and Senate versions] present a new idea in acquiring Indian lands, and if this bill should be enacted into law it will establish a new policy and be a departure from the policy that has long since prevailed in acquiring Indian lands, as heretofore it has been the practice and policy of the Government to purchase lands from the Indians and pay them therefor and then open the same to entry and settlement, and if not immediately, ultimately, under the provisions of what is known as the free-homestead act.
>
> This bill [referring to the House bill] provides that the lands shall be disposed of under the homestead laws by the settler paying therefor and the proceeds paid to the Indians, and it is expressly provided by section 6 of this bill that the United States shall in no manner be bound to purchase any portion of the land except the school sections, or to dispose of the same except as provided, or to guarantee to find purchasers for said lands, it expressly stating that the intention of the act is that the United States shall act as trustee for the Indians in disposing of the lands and pay over the proceeds from the sale thereof only as the same are received. H.R.Rep.No. 443, 58th Cong., 2nd Sess. (1904).

Of the six reservations in South Dakota opened for settlement only one was opened under the earlier method of payment: the Lake Traverse Reservation in 1891. The statute opening it was a prime example of a cession statute. The United States government purchased about 770,300 acres from the Indians for $2.50 an acre, and, in return, the Indians promised to "cede, sell, relinquish, and convey to the United States all their claim, right, title and interest." *De-Coteau, supra*, 420 U.S. at 428, 95 S.Ct. 1082; 26 Stat. 1036 (1891). The government then undertook to sell the land to settlers.

In 1901, negotiations began with the Indians on the Rosebud reservation to open for settlement Gregory County which was on the eastern edge of the reservation. *Rosebud, supra*, 430 U.S. at 590, 97 S.Ct. 1361. As was then the custom, the United States promised to pay the Indians a set amount, $1,040,000, and the Indians agreed to cede, convey and transfer all of their interest in the land to the government. *Id.* at 591, 97 S.Ct. 1361. The agreement was returned to Congress for ratification but the movement to change the method of obtaining Indians lands had begun and Congress would not ratify the agreement. Comment, *New Town et al.: The Future of An Illusion, supra*, 18 S.D.L.Rev. at 94. For three years Congress debated how the Indians should be compensated. Finally, in 1904, an agreement was reached and a statute opening Gregory County in the Rosebud Reservation was passed. 33 Stat. 254 (1904). Like many products of changing policy, this statute had elements of both the old and new policy. Section one stated:

> The said Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in . . . Gregory County . . . . *Id.*

However, in consideration the United States no longer promised to pay a sum certain; it merely "stipulate[d] and agree[d] to dispose of the [land] to settlers . . . and to pay to said Indians the proceeds derived from the sale of said lands." *Id.*, Art. II. Justice Marshall has suggested that this combination of two payment policies may have resulted because "Congress found that working from an earlier document—in this case the 1901 Agreement—was easier than drafting a new law." *Rosebud, supra*, 430 U.S. at 619, 97 S.Ct. at 1379 (Marshall, J., dissenting). It is also possible that the drafters of the 1904 statute hoped that by parroting the words of § 1 of the 1901 agreement they would obfuscate the dramatic change in the method of payment they were effecting. For whichever reason, the end result was a statute which contains the crucial cession language but which has none of the elements of the payment scheme of a "cession" statute, i. e., the government is not the purchaser but is merely the agent for the Indians, and the Indians are not guaranteed a set amount for their land but are promised only what the settlers actually pay.

Every statute opening reservations in South Dakota passed after 1904, including the one at issue, contains the new method of payment and § 1 of each statute reads: "[T]he Secretary of the Interior . . . is . . . authorized . . . to sell and dispose . . . ." Section one of these statutes has no cessation language. In three instances, the land opened for settlement is referred to as the "ceded" land [21] in another portion of the statute. I cannot believe, however, because of the clear reason why cession language was originally used and because of the casual use of this language by the drafters of the statute, that these isolated references should be seen as Congress's attempt to speak on the complex issue of jurisdiction.

Thus, although this analysis is complicated somewhat by haphazard drafting of stat-

21. In the 1906 statute opening part of the Lower Brule Reservation for settlement and the 1910 statutes opening parts of the Pine Ridge and Rosebud reservations, a proviso in § 1 referred to the portion opened as "the tract ceded." 34 Stat. 124 (1906); 36 Stat. 448 (1910); 36 Stat. 440 (1910).

utes, I think the unavoidable conclusion is that the word "cede" is nothing more than a reflection of changing payment schemes and is of little significance to the boundary issue.

The Supreme Court's treatment in *Rosebud* of the three statutes opening for settlement portions of the Rosebud Reservation supports the view that the cession language is not crucial. As stated, the 1904 statute, opening Gregory County for settlement, contained the § 1 cession language ("the Indians belonging on the Rosebud Reservation . . . cede, surrender, grant, and convey . . . ."). The 1906 statute, opening Tripp and Lyman counties (which is identical to the 1908 statute before us), contained absolutely no cession language. The 1910 statute opened Mellette county and, like all statutes passed after 1904, did not contain cession language in § 1 but authorized the Secretary to sell and dispose of the opened land. However, a proviso in § 1 referred to the land opened as "the tract ceded." Despite this inconsistency in language among the statutes and the absence of the word cede in the 1907 statute, the Supreme Court held that all three statutes evinced an intent to terminate the reservation status of the respective areas opened, *Rosebud, supra*, 430 U.S. at 605–606, 97 S.Ct. 1361. In so doing the Court reasoned that the statutory language was not the only indicia of Congressional intent and looked to other factors. Thus the Court began to deemphasize the significance attached to the cession language. Because of the history of the statutes opening for settlement Indian reservations in South Dakota, I believe this court should carry the Supreme Court's conclusion one step further. Not only is the presence or absence of cession language not "crucial" to the boundary issue, it is unrelated and thus irrelevant.

A finding that the cession language is not relevant to the disestablishment issue is important because the lack of cession language, and the assumption that it manifests an intent *not* to disestablish reservation boundaries, has been used to counterbalance other aspects of the 1908 statute opening

the Cheyenne and Standing Rock Reservations which courts have admitted could lead to the conclusion that Congress intended to disestablish the original reservation boundaries. *See, e. g., Rosebud, supra*, 430 U.S. at 599, 613, 97 S.Ct. 1361; *Long Elk, supra*, 565 F.2d at 1038–39.

One of the characteristics which various courts have admitted is indicative of an intent to disestablish original reservation boundaries is the "school lands provision." This provision is present in the 1908 statute we are asked to interpret. Section 7 of the 1908 statute requires that sections sixteen and thirty-six of every township opened for settlement must be reserved for the State of South Dakota to be used for public schools. When South Dakota was granted statehood, the enabling statute required that sections sixteen and thirty-six of every township of land made a part of the state be reserved and used for school purposes. 25 Stat. 679, § 10 (1889); *Rosebud, supra*, 430 U.S. at 599, 97 S.Ct. 1361. This enabling statute specifically declared that reserving sections sixteen and thirty-six for the state was not necessary if the townships were part of an "Indian reservation." Thus, the reasonable conclusion is that, because sections sixteen and thirty-six in every township in the opened portion were explicitly reserved for public schools in the 1908 statute before us, and because reserving these sections is not necessary if the townships are part of a reservation, the opened area is not part of the reservation.

Another example of an aspect of the 1908 statute which could lead one to believe Congress intended to disestablish the original reservation boundaries is section 10, the intoxicants provision, which was added by amendment in May of 1910. 36 Stat. 448 (1910). This provision forbade the use of intoxicants in the area opened for settlement. Because use of intoxicants was already forbidden on Indian reservations, 27 Stat. 260 (1892), the specific ban in the opened territory would not have been necessary if this land was still part of the reservation.

In conclusion, I believe courts can no longer adhere to the view that the presence or absence of cession language is relevant to the disestablishment issue. A finding that the cession language is irrelevant to the disestablishment issue would have two immediate consequences. First, we could not rely on this language to ascertain Congress's intent on the boundary issue but must look to other factors which are indicative of Congress's intent. Second, because there is no longer any statutory language to counterbalance the school lands and intoxicants provisions, the evidence these provisions provide of Congress's intent to disestablish boundaries becomes stronger.

*The Role of the Federal Government and the Payment of a Sum Certain*

In the past, courts have highlighted these two factors holding that placement of the U.S. Government in the role of purchaser of the Indian lands and payment to the Indians of a sum certain was evidence that the land opened for settlement ceased to retain its reservation status. Conversely, the fact that the government was less than a purchaser of Indian lands (i. e., served as a sales agent) and that the Indians were not paid a sum certain, was evidence that the land opened for settlement retained its reservation status. In the 1908 statute presently before the court the government was a sales agent, not a purchaser, and the Indians were paid only what the settlers paid over, not a sum certain. On this basis, then, some courts would hold that the area opened for settlement retained its reservation status. I cannot agree.

As explained above, these two factors are interrelated with the first factor, the cession language: in "cession" statutes the government is a purchaser and the Indians are paid a negotiated amount. In the "sell and dispose" statutes the government serves as an agent for the Indians (selling the lands and collecting the proceeds) and the Indians are paid only what the settlers actually pay. It should be apparent, therefore, that these two factors, the role of the U.S. Government and whether the Indians are paid a sum certain, are similarly not indicative of Congress's intent on the boundary issue but reflect its intent to minimize the costs to the government of obtaining Indian lands.

Recently courts have begun to recognize this. The foremost authority originally attaching importance to the sum certain element was the Supreme Court in *DeCoteau*, where the Court distinguished the case before it, in which it found disestablishment, from *Seymour* and *Mattz*, where it found no disestablishment, on the following ground:

> The [cession statute] before us is a very different instrument . . . it also appropriates and vests in the tribe a sum certain . . . . The [sell and dispose] statute in *Mattz*, by contrast, benefitted the tribe only indirectly, by establishing a fund dependent on uncertain future sales of its land to settlers. *DeCoteau, supra,* 420 U.S. at 448, 95 S.Ct. at 1094.

In *Rosebud*, however, two years later, the Supreme Court, over vigorous dissent, deemphasized the significance attached to the sum certain element. The Court acknowledged that the sum certain payment in *DeCoteau* "aided us in determining that congressional intent was to terminate the Reservation." *Rosebud, supra,* 430 U.S. 598 n. 20, 596 n. 18, 97 S.Ct. 1361, 1369, 51 L.Ed.2d 660. But the Court continued, "as the Court of Appeals in the instant case recognized, '[t]he determination of disestablishment . . . rests upon congressional intent, as to which the method of payment, whether lump-sum or otherwise, is but one of many factors to be considered.' 521 F.2d [87] at 102." *Id. See also Erickson, supra,* 478 F.2d at 687 (it is not significant that the proceeds of the sale were to be deposited with the Treasury and credited to the Indians).

It was in *Rosebud* also that the Court deemphasized the importance of the role played by the government, at least according to Justice Marshall's dissent. Justice Marshall highlighted the fact that the Rosebud statutes, which the majority found disestablished the original reservation boundaries, were similar to the *Seymour* and *Mattz*

statutes, which were held not to have disestablished the boundaries, in that "Congress merely 'opened' a reservation—that is, made reservation lands available to non-Indians *and acted as a sales agent on behalf of the Indians.*" *Rosebud, supra,* 430 U.S. at 617, 97 S.Ct. at 1378 (Marshall, J., dissenting) (emphasis added). Justice Marshall lamented the fact that the majority was no longer attaching significance to the different role played by Congress in the "cession" and "sell and dispose" statutes. The majority did not explicitly discuss the role of the United States in reaching its holding. However, Justice Marshall may well be correct for the majority held that the three statutes opening various parts of the Rosebud reservation disestablished the original boundaries of the reservation. In all of these statutes, as in the *Seymour* and *Mattz* statutes, where no intent to disestablish was found, the United States acted as "sales agent" for the Indians, rather than purchaser.

This court's opinion in *Rosebud* also recognized that the role played by the United States in the statutory scheme was not relevant to the disestablishment issue:

> The argument of the Tribe that . . . the Indian title to the lands "was not extinguished" rests in part upon the theory that under such Acts "the United States acted as trustee to dispose of the land and credit the proceeds to the Tribe." . . . The argument made will not withstand analysis in the light of the realities of the situation confronting the Congress at the time. . . . [T]he fact that a beneficial interest is retained [by the tribe] does not erode the scope and effect of the cession made, or preserve to the reservation its original size, shape, and boundaries. . . .

*Rosebud Sioux Tribe v. Kneip,* 521 F.2d 87, 101–02 (8th Cir. 1975), *aff'd,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1976).

In conclusion, I believe it apparent that the form of payment and role played by the United States government is again reflective of the scheme of payment rather than Congress's intent on the disestablishment issue and, like the words of cession, is not relevant to the disestablishment issue.

*The Legislative History*

In *Erickson, supra,* 478 F.2d at 688, this court noted that the House and Senate Reports are "silent as to the 1908 Act's effect upon the boundaries of the Cheyenne River Reservation." However, attached to these reports and expressly made a part thereof is correspondence from McLaughlin and the minutes of council meetings McLaughlin held with the Indians. This supplemental report, as quoted *supra,* shows that McLaughlin, who was sent to explain the treaty to the Indians, was told to follow the same instructions he had followed regarding the Rosebud Reservation, where he negotiated a change in boundaries. At the council meetings McLaughlin clearly equated opening the lands for settlement with a change in boundaries. Furthermore, McLaughlin told the Indians the statute they were considering would affect them in a similar manner as the statute which opened part of the Rosebud Reservation, where disestablishment was found. In other words, in the only part of the legislative history where the issue was raised, it is clear a change in boundaries was contemplated.

Moreover, the legislative history for all three Rosebud statutes, which was not available to this court in *Erickson,* has been made part of the record in the case before us now. These documents, by themselves and because of the background they provide for otherwise inconclusive statements in the legislative history concerning the statute before us, shed considerable light on the term "cession" and the interrelationship of all statutes opening South Dakota Reservations. In these documents, the drafters of the legislation, the Commissioner of Indian Affairs and James McLaughlin repeatedly explain the new payment policy, equate the impact of statutes containing cession language with statutes containing no cession language and otherwise show that a change in boundaries is contemplated whenever Indian lands are open for settlement.

In conclusion, because of the wealth of information made available in this case, I do not believe this court should continue to say that the legislative history is silent. On the contrary, this history unequivocally demonstrates that disestablishment was contemplated in this case and that the 1908 statute before us was intended to have the same effect as other statutes where disestablishment was found.

*Whether an Agreement was Reached with the Indians*

Another factor which has been relied upon to help ascertain Congress's intent on the disestablishment issue is whether an agreement was reached between the negotiator on behalf of the government and the Indians. *See, e. g., Long Elk, supra,* 565 F.2d at 1039. In some cases a written agreement signed by the Indians was obtained. *See, e. g., Rosebud, supra,* 430 U.S. at 587 n. 2, 97 S.Ct. 1361. In my opinion, the fact such an agreement was obtained does not necessarily mean the boundaries of the original reservation were altered, or conversely, if no such agreement was obtained, the boundaries of the original reservation were not altered.

Until 1903, the Indians' consent to partition of their lands was necessary. In 1903, however, the Supreme Court declared that, because Indians were wards of the United States government, their consent was no longer necessary before their lands could be taken. *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). Therefore, after 1903, the lack of a written agreement signed by the Indians reflects the Supreme Court's decision in *Lone Wolf,* not whether or not the Indians consented to a change in boundaries.

However, an agreement with the Indians is still relevant in that it is a contemporaneous understanding of the Indians' perception of what the opening of their land entails. A written agreement would, of course, be the most enlightening representation of this understanding but none was obtained from the Cheyenne River Reservation Indians. Moreover, after reviewing the minutes of McLaughlin's meeting with the Indians, it is questionable whether an oral agreement was reached. The clear impression is that McLaughlin forced through the plans to open part of the reservation and the Indians were not at all sure they wanted to part with their land, especially under the terms McLaughlin offered. However, McLaughlin wrote the Secretary of the Interior that an agreement had been reached: "The general sentiment of the Indians in council with me at the agency was in favor of the relinquishment . . . ." [22] And, both Senator Gamble and Congressman Marshall, the sponsors of the bill in Congress, reported that "[t]he bill as originally drawn was submitted formally to the Indians upon both reservations through an experienced Indian inspector, and after full conference with the Indians upon each reservation an agreement has been reached and the bill has been modified and amended in conformity to said agreement." S.Rep.No.439, 60th Cong., 1st Sess. 4 (1908); *cf.* H.R.Rep.No.1539, 60th Cong., 1st Sess. 3 (1908). Moreover, as discussed *supra,* the minutes of this council meeting demonstrate that McLaughlin and the Indians, while perhaps not reaching an agreement, were at the least both anticipating a change in boundaries if Congress got its way. I do not highlight these references by McLaughlin to an agreement reached with the Indians because I believe these admittedly "self serving statements" are evidence of an agreement. Rather, I believe these statements by McLaughlin, the official representative of the Congress, in his report to his superiors, are indicative of the information available to Congress and thus what Congress believed had transpired.

*Subsequent Jurisdictional Treatment of the Opened Portion of the Reservation*

The last major factor considered indicative of Congress's intent on the disestablishment issue is the jurisdictional history of the contested area after it was opened for settlement. Both parties have pointed to characterizations of the opened area made

---

22. S.Rep.No.439, Part 2, 60th Cong., 1st Sess. 3 (April 15, 1908).

since 1908 by Congress and the Secretary of the Interior which they argue support their respective positions. Congress and the Secretary, in various statutes and regulations, have referred to the opened area as "the Cheyenne River Indian Reservation" and as "the former Cheyenne River Indian reservation."[23] Appellant and the Tribe, as amicus, urge that these contradictory references result in an ambiguity which must be resolved in favor of the Indians. Were these scattered references all of the evidence available as to the subsequent jurisdictional treatment of the opened area, I would agree. There exists, however, evidence which is more relevant and also unambiguous on this point: the legal power, since 1908, to exercise jurisdiction in the opened area.

Since 1911 and until this court's decision in 1972, the case law consistently recognized that South Dakota had criminal jurisdiction in the opened area on nonallotted land. *See, e. g., United States v. La Plant,* 200 F. 92 (D.S.D.1911); *Lafferty v. State,* 80 S.D. 411, 125 N.W.2d 171 (1963); *State v. Sauter,* 48 S.D. 409, 205 N.W. 25 (1925). At trial Mr. Aberle, the present States Attorney for Dewey County, South Dakota, testified that, based upon (1) his acquaintance with the two individuals who had served as States Attorneys since 1911 and his discussions with these gentlemen about the county's jurisdiction over crimes on the reservation, (2) his search of the county records and (3) his own knowledge as States Attorney since 1959, while the federal and tribal courts had assumed jurisdiction over the

**23.** Some of the arguments advanced are fairly tenuous. The Supreme Court was faced with one of the arguments presented by the Tribe in this case. On December 27, 1935, the Secretary of the Interior approved a constitution and bylaws for the Cheyenne River Sioux Tribe which contains the following provisions:

> The jurisdiction of the Cheyenne River Reservation Sioux Tribe of Indians shall extend to the territory within the original confines of the diminished reservation boundaries which are described by the Act of March 2, 1889 (25 Stat. 888).

The tribe argues this approval provides implicit support for the view that the boundaries were not diminished. This reach for tangential support was similarly rejected by the Supreme Court in *Rosebud, supra,* 430 U.S. at 616 n. 1, 97 S.Ct. 1361.

The tribe, in its amicus brief, cites as another example of the Secretary's view that the opened portion was still part of the reservation the fact that he acquiesced in the tribe's insistence that the new Indian Agency be built "on the reservation." The Agency was built in Eagle Butte. However, the law does not require that the Indian Agency be built "on the reservation" as amicus states. Instead, it requires that the "agent for said Indians . . . reside among them [the Indians]." 15 Stat. at 636. Because Eagle Butte is in the center, geographically and demographically, of the original reservation, it was an ideal central location and used as the site for the agency for that reason, not because it was required to be "on the reservation." *Hoxie, Jurisdiction on the Cheyenne River Indian Reservation, supra,* Letter to Congressman Burke from John Mertens (attached to front cover of exhibit as Attachment "A").

In another example, the tribe argues that "the Secretary's actions under 25 U.S.C. § 463, which authorized the restoration of surplus lands to Indian reservations, provides further confirmation for the conclusion that the 1908 legislation did not disestablish affected reservation areas." In 1934, Congress provided that lands in portions of reservations which had been opened for settlement and which had never been purchased could be returned to the tribe "if [the Secretary of the Interior found] it to be in the public interest." The tribe points to a 1934 decision from the Solicitor of the Department of the Interior which states that Indians lands subject to a prior cession [*i. e.,* a change of boundaries] could not be restored subsequently to an Indian reservation. 54 I.D. 559, 560 (1934). The tribe argues that, because of this decision and because these lands were restored to the tribe, the Secretary of the Interior did not believe the boundaries of the original reservation ever changed. However, in a subsequent decision the Solicitor held that it was not a prerequisite to restoring lands to Indians under this statute that the land still be part of a reservation. 56 I.D. 330, 333 (1938). Moreover, as the tribe argues, the Secretary, in his orders restoring various plots of land to the Cheyenne River Sioux Tribe, referred to the portion opened in 1908 as part of the reservation (implying, according to the tribe, that the opened area retained its reservation status). However, in this same order the Secretary also referred to the opened area as "ceded land" and as being outside the "existing reservation." 32 Fed.Reg. 14, 276 (1967); 22 Fed.Reg. 3693 (1957).

As can be seen, the arguments presented by the tribe to the effect that the Secretary has, since 1908, recognized the opened area to be part of the reservation are variously flawed.

allotment land in the opened portion of the reservation since 1908, the State of South Dakota had assumed civil and criminal jurisdiction over the nonallotted lands in the opened portion until 1972. The County Commissioner for Dewey County and the U.S. Attorney who served from 1940 to 1969 [24] also testified that the state courts exercised criminal and civil jurisdiction in nonallotted areas of the opened portion until *Erickson* in 1972.

Moreover, even sources quoted by Professor Hoxie, appellant's expert witness,[25] in his historical analysis, show that South Dakota had criminal jurisdiction in the non-trust portions of the opened area.[26] Nevertheless, Professor Hoxie focused on two facts which he thought indicated the state

did not have jurisdiction: (1) the federal government continued to exercise criminal jurisdiction and provide services for the Indians in the opened area, and (2) for a variety of reasons, the actual role of the state courts in exercising criminal jurisdiction in the opened area was marginal.

While it is true the federal government continued to exercise criminal jurisdiction and provide services [27] for the Indians in the opened portion of the reservation after 1908, this does not mean the state courts did not have jurisdiction. The law then provided that the federal government had jurisdiction over Indian allotments whether the allotments are within or outside reservation boundaries. *United States v. Ramsey,* 271 U.S. 467, 472, 46 S.Ct. 559, 70 L.Ed. 1039

**24.** Mr. Clayton, the U.S. Attorney for South Dakota from 1940 to 1969, was unable to testify in court on the day he was scheduled. The parties stipulated that he would testify that the State of South Dakota exercised criminal jurisdiction in the opened portion of the reservation.

**25.** Dr. Frederick Hoxie, Ph.D, was retained by the government as an expert witness to document the history of the Cheyenne River Reservation. Professor Hoxie is a professor of history specializing in the American Indian. His one hundred thirty-four page report, with its accompanying one hundred eighteen appendices, has been extremely helpful. While I have made use of the facts presented by Professor Hoxie, I cannot, for the reasons outlined above, accept his conclusion as to the jurisdiction of that portion of the reservation which was opened for settlement in 1908.

On appeal appellant alleged as error the failure of the district court to let Professor Hoxie testify. The court admitted Professor Hoxie's report but restricted his testimony not on the ground "there is no such thing as an historian expert," as the government alleges, but on the ground Professor Hoxie's testimony, which admittedly would only highlight the report already in the record, would be duplicative. (Tr. 28, 36–37). There is nothing improper in such a ruling nor has it prejudiced appellant in any way since Professor Hoxie's extensive report speaks for itself.

**26.** *See, e. g.,* the following statement by Thomas King, the Superintendent of the Indians on the Cheyenne River Reservation where the acknowledges that legally the state had jurisdiction over Indians with certain allotments:

If the trust patent is dated before May 8, 1906, the allottee is a citizen and has the rights of citizenship. By Act of Congress he

is made subject to the civil and criminal laws of the State of South Dakota and he is subject to those laws if the state officers see fit to apply them to him. He is also entitled to the benefits of the civil and criminal laws of the State of South Dakota should he desire the benefit of those laws. However, it is generally found, where Indians of this class are living on trust allotments and living within an Indian reservation, that they are considered subject to the jurisdiction of the United States Government and its officers, by reason of the fact that they still maintain tribal relations and the United States Government has exclusive jurisdiction over their allotments and the land and county in which they reside." Hoxie, *Jurisdiction of the Cheyenne River Indian Reservation, supra,* at 118–119, quoting Letter from Superintendent King to Walter Huddleston, March 5, 1910 (Special Series A, Box 1, Records Group 75, National Archives).

King went on to point out that, as a matter of custom rather than by legal requirement, the State government did not assume its responsibility.

It is also the custom of the county government to concede the jurisdiction of the United States Government and not to apply the state laws to such Indians as they would to white men, but to leave them to the jurisdiction of their agent. Of course you will understand by this that it is a practice or custom, not a legal condition." *Id.* at 119.

**27.** The federal government continued to provide the following services for the Indians on the opened portion of the reservation: Indian Schools, "boss farmers" (farmers assigned to the reservation to teach the Indians agricultural skills).

(1925); *United States v. Pelican,* 232 U.S. 442, 447, 34 S.Ct. 396, 58 L.Ed. 676 (1914). At the time the reservation was opened for settlement, fifty-five percent of the Cheyenne tribe had allotments in the opened portion and thereby occupied one-third of the acres opened for settlement. Hoxie, *Jurisdiction of the Cheyenne River Indian Reservation: An Analysis of the Causes and Consequences of the Act of May 29, 1908,* at 38. The federal government still had responsibilities in these specified areas despite state jurisdiction over the rest of the opened area. Therefore, the fact that the federal government assumed these responsibilities does not detract from the conclusion that the State of South Dakota had criminal jurisdiction in the rest of the opened area.

The second point raised by Professor Hoxie, that the actual exercise of criminal jurisdiction by the state courts was minimal, also does not detract from the conclusion that the state courts legally had jurisdiction in the opened portion. According to Professor Hoxie, the criminal jurisdiction exercised by the state courts over the opened area was minimal for several reasons. The state courts were impoverished and, because most of the Indians did not pay taxes, they did not want to expend scarce resources on the Indians. Nor, Professor Hoxie argues, were the Indians eager to get into state courts: the prejudice and lack of concern for rights of Indians made a fair trial unlikely. Lastly, the tribal courts and federal courts, as mentioned above, processed most of the Indian criminal matters in the opened portion, even after 1908.

There are, however, two problems with Professor Hoxie's argument that, because the exercise by state courts of criminal jurisdiction in the opened area was minimal, the state did not have such jurisdiction. First, I am not sure his picture of the state courts' inactivity over criminal matters in the opened portion of the reservation is reflective of the jurisdictional issue. Professor Hoxie's analysis covered only 1910 to 1920—clearly a time when South Dakota was still a frontier. Moreover, the county governments were not even organized until after 1908. It is doubtful, given the frontier mentality and the new and impoverished nature of the county governments, that the state courts assumed a very active role in law enforcement at all.

The second and by far more fundamental problem with Professor Hoxie's argument, in my view, is that he is ignoring what the law actually provided the state court's responsibility to be and is focusing instead on the failure of state courts to carry out their legally-imposed duties. In our endeavor to ascertain Congress's intent on the jurisdictional status of the opened portion, I believe what the lawmakers actually provided the state's jurisdictional power was to be is more relevant than how, by mismanagement, the state courts avoided the law.

In summary I find that, while at least initially the state courts were not efficient in assuming jurisdiction over the nonallotted area in the opened portion of the reservation, case law and officials charged with enforcing the law recognized that the state courts had jurisdiction, at least until 1972, over unallotted land in the opened portion.

In conclusion, I believe we cannot look to the cession language in statutes or Presidential proclamations, the role played by the United States government, the fact the Indians were not paid a sum certain, or the lack of an agreement signed by the Indians as indicative of Congress's intent on the boundary issue. All of these factors originated for reasons completely unrelated to the boundary issue. However, the factors which are relevant to the boundary issue— the historical context, the legislative history and the subsequent jurisdictional treatment—show clearly that termination of reservation status was contemplated. The 1908 statute was one part of a comprehensive movement, the object of which was to disestablish as much Indian land as possible. The legislative history in this case and the *Rosebud* case demonstrates that a change in reservation boundaries was anticipated. Lastly, while the actual exercise of criminal jurisdiction by the State of South Dakota over the opened area was initially inconsistent, the state's legal power to exercise such

jurisdiction, at least until *Erickson*, was clearly acknowledged by judicial precedent and by state and federal law enforcement officials. For these reasons I would hold that the portion of the Cheyenne River Reservation which was opened for settlement in 1908 was disestablished from the reservation and thereby lost reservation status.

Although I would hold that the portion of the Cheyenne River Reservation opened for settlement lost its reservation status, this holding would not necessarily settle the issue of whether the opened area is "Indian country" and thus whether federal or state courts have criminal jurisdiction over the area. Title 18 U.S.C. § 1151 provides that, in addition to territory within an Indian reservation, "dependent Indian communities" and "all Indian allotments" are "Indian country" for the purposes of federal criminal jurisdiction.[28] Presumably because a ruling on the reservation status of the opened area could have resolved the jurisdictional issue, the parties did not present evidence on the question whether Eagle Butte is a "dependent Indian community" or an "Indian allotment."[29] I would therefore remand to the district court to provide the parties the opportunity to argue this point.[30]

28. I realize that the possibility of retaining federal jurisdiction over random plots of land which are dependent tribal communities or Indian allotments will result in the unfortunate problem of checkerboard jurisdiction, where law enforcement officers will be forced to consult a map before they know their duties toward a particular area. *See Seymour, supra,* 368 U.S. at 358, 82 S.Ct. 424. However this cannot be helped. Such a result is mandated by 18 U.S.C. § 1151 and is possibly in effect at the present in the Rosebud, Pine Ridge and Lake Traverse Reservations as a result of court decisions. *Rosebud, supra,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660; *DeCoteau, supra,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300; *United States ex rel. Cook v. Parkinson, supra,* 525 F.2d 120.

29. This court does not have sufficient evidence before it to answer the question whether federal jurisdiction continues over Indian allotments in that portion of the reservation opened for settlement. As stated, fifty-five percent of all Indians on the Cheyenne River Reservation had allotments on the portion of the Reservation which was opened in 1908. When these allotments were originally granted they were held in trust by the United States government for a period of twenty-five years. This trust provided that any conveyance of the land was null and void, a limitation which was designed to protect the Indians from their own improvidence. As long as the trust status of the allotments continues, there is federal jurisdiction over the allotments. *United States v. Ramsey,* 271 U.S. 467, 470, 46 S.Ct. 559, 70 L.Ed. 1039 (1925); *United States v. Pelican,* 232 U.S. 442, 447 and 449–50, 34 S.Ct. 396, 58 L.Ed. 676 (1914). No evidence has been presented thus far in this case as to whether the trust status of these allotments has been extended such that it still remains today. *Cf. DeCoteau, supra,* 420 U.S. at 443 n. 29, 95 S.Ct. 1082.

30. Even if the real parties in the case, the United States and Glen Dupris, may not wish to litigate these additional issues, the amicus curiae parties, the Cheyenne River Sioux Tribe and the counties of North and South Dakota may wish to do.